UNITED STATES of America, Plaintiff,

v.

Larry FRENCH et al., Defendants.

Crim. No. 76–76–D.

United States District Court,
W. D. Oklahoma.

May 5, 1976.

David L. Russell, U. S. Atty., by Drew Neville and Duane H. Miller, Asst. U. S. Attys., Oklahoma City, Okl., for plaintiff.

James A. Clark, Denver, Colo., for defendants Jacobs and Brutico.

## ORDER ON MOTION TO SUPPRESS OF DEFENDANTS JACOBS AND BRUTICO

DAUGHERTY, Chief Judge.

Defendants Jacobs and Brutico have moved this court to enter an order suppressing certain evidence pursuant to Rule 41 and Rule 12 of the Federal Rules of Criminal Procedure, on the ground that said evidence was the poisoned fruit of at least two illegal searches. On April 29, 1976, the court conducted an evidentiary hearing and based upon the evidence adduced therein finds the essential facts controlling the controversy are that on October 11, 1975, an agent of the Drug Enforcement Administration acting in an undercover capacity and who was also duly commissioned as a custom agent, flew a DC–6 containing 8000 pounds of marijuana into the United States from South America. He was accompanied by two other employees of the Drug Enforcement Administration. Upon entry into the territory of the United States he seized the green leafy substance which had been imported and landed in New Orleans, Louisiana, where they were met by other government agents. A field test was conducted which proved positive for marijuana by one of these agents and another government agent then implanted electronic tracking devices in two of the approximately 250 bags of marijuana. Thereafter the pilot continued the flight to Chickasha, Oklahoma, where the plane was met by certain of the defendants. Prior to the landing law enforcement officers had set up surveillance around the airfield. The transfer of the marijuana from the plane into two Hertz rental trucks was made in the presence and

under the observation of federal agents. They were then able to maintain constant visual surveillance as the trucks traveled to Shawnee, Oklahoma, and then after an overnight stop to the Gallman farm near Goshen, Arkansas. Officers then observed the marijuana to be unloaded from the Hertz trucks into a barn on the farm. There was no electronic tracking of the contraband from New Orleans, Louisiana to the Arkansas destination.

Agents of the Drug Enforcement Administration continued to maintain an uninterrupted surveillance of the barn. On October 14, 1975, at approximately 9:30 p. m. a blue 1971 Chevrolet panel truck arrived at the barn and several sacks of the marijuana were moved from the barn and placed in the truck. This truck was then followed to the Scottish Inn Motel in Fayetteville, Arkansas, where the driver parked the truck around 10:00 p. m. and entered room 209. Shortly after midnight of October 15, 1975, defendant Jacobs arrived at the Scottish Inn driving a 1974 Dodge. He parked this vehicle and went into room 209. Sometime later that day he came out of this room and got into the 1971 blue Chevrolet panel truck. He then drove it to Burlington, Colorado, where he spent the night at the Ramada Inn. He was trailed at all times on the ground by officers who, although they were aware of the presence of the "beeper" in the marijuana cargo, did not utilize it in any way to keep track of the truck and at all times kept in visual contact with the vehicle. The truck was also being observed from the air and the pilot at one time over western Kansas checked to see if the device was emitting signals. Although he found that it was, its use was unnecessary since the pilot never lost view of the truck.

After Jacobs left Burlington the ground surveillance continued uninterruptedly and again these agents never attempted to use the electronic tracking device. However, a pilot who flew out from Denver to participate in the air surveillance did turn on his tracking equipment but found the signals so weak and indistinct they were of no value to him and he was able to maintain constant visual observation of the vehicle.

Jacobs drove the truck to an 85-acre farm which he had rented in a remote area near Nederland, Colorado. The house was located north of an east-west private road which ran across the property and could not be viewed from the public road. Jacobs drove through the gateway at the entrance to the farm on to the private road and proceeded to the house. The agents on the ground, who had maintained their visual contact, followed through the gateway and down the private road past the driveway to the house. They then took up a vantage point north of the road and east of the house among some sparse trees where they could observe the activities at the house. They were then able to see the defendant Jacobs assisted by defendants Brutico and Fishkin unload some of the marijuana from the truck and carry it into the house. At this time the agents closed in and arrested these three defendants. A search warrant was thereafter obtained for the house rented by Jacobs and the 1971 blue panel truck which had been driven by him. In the execution of these warrants the agents seized 23 sacks of marijuana.

Specifically the movants ask that the court suppress all tangible evidence seized in these searches conducted at the farm as well as all testimony concerning their movements and activities from Fayetteville through their arrest. They contend that the installation of the electronic tracking device in the marijuana at New Orleans, Louisiana and any subsequent monitoring violated their Fourth Amendment rights. They also assert that the federal agents conducted an illegal search within the meaning of the Fourth Amendment by maintaining visual surveillance of defendant Jacobs' house and the surrounding area which was allegedly accomplished by means of an unlawful trespass. They do not contend that the search warrants were facially invalid but argue that the fruits obtained were fatally tainted by the preceding illegal conduct under the doctrine of *Wong Sun v.*

*United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The critical questions presented are:

1. Did the installation of the electronic device and any monitoring of it require prior judicial approval based on probable cause?

2. Was the entry upon the Jacobs farm and subsequent surveillance an unconstitutional invasion of movants' Fourth Amendment rights?

3. "Whether granting the establishment of the primary illegality the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* supra at 487–488.

█ The court concludes that all issues must be determined adversely to the movants. As soon as the marijuana entered the territory of the United States it became contraband illegally imported into the United States and was subject to seizure by customs officers or other authorized agents. Its interception by the agents upon the entry into the United States was a legal border seizure. See *United States v. Galvez,* 465 F.2d 681 (CA10 1972). Having lawfully seized the contraband the agents could lawfully implant the "beeper". Logically since the officers could absolutely seize the contraband the lesser act of inserting the tracking devices must necessarily be permissible. Since it was unnecessary for a warrant to be obtained to seize the contraband it was unnecessary to ask a magistrate for an order to install the tracking devices. The act of inserting the devices in the contraband under the circumstances here presented violated nobody's constitutional rights.

The agents could undertake a controlled or monitored delivery of the intercepted contraband to the ultimate recipients. *United States v. Galvez,* supra. It is not impermissible to permit contraband to reach its destination for:

"If contraband were simply seized by customs agents and disposed of, then the intended receivers of the illicit goods would go unpunished."

*Chapman v. United States,* 443 F.2d 917, 920 (CA10 1971).

The location of the "beeper" within the 1971 Chevrolet blue panel truck was not accomplished by any act of a government agent. It was the criminal conspirators themselves that took the marijuana from the barn and placed it in the truck to be driven by Jacobs from Arkansas to Colorado. There was no actual trespass by the government resulting in the presence of the "beeper" on board Jacobs' truck. The absence of government activity at the farm negatives any requirement at that time for antecedent judicial approval. The government did nothing in Arkansas to require judicial sanction.

█ Having determined there was no forbidden government action in the installation of the "beeper" in the contraband and its ultimate location within the truck does not resolve the question of the legality of monitoring the device. It would appear that the more significant judicially cognizable event, if any, is the monitoring of the device rather than its installation, for only then is any information yielded which perhaps makes it a search. The device emits a radio signal which enables its location to be determined by directional finders. It does not record sound nor transmit conversation. Its use in this case was for the purpose of tracking the marijuana. It was only coincidental that it came to rest in the particular truck and that Jacobs happened to be the driver. Its use was aimed not at keeping track of Jacobs or the truck as such. It is true, of course, that the Fourth Amendment does not limit only searches and seizures of tangible property but extends as well to some kinds of electronic surveillance of persons. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This court cannot, however, equate the tracking of contraband with the recording of telephone conversations. There was here no electronic surveillance of any person. What expectation of privacy was here infringed—did Jacobs have a reasonable ex-

pectation that he could secrete marijuana and not be observed? Could it be argued that the electronic burglar alarm which emits the silent signal that its circuit has been broken violates any constitutional right of privacy of movement of the burglar who is caught inside the establishment because his whereabouts has been disclosed by the electronic surveillance? Clearly viewed there is not implicated here any claimed right to maintain the privacy of one's personal movements and locations. So far as the "beeper" was concerned the activities of Jacobs were irrelevant. The "beeper" did not make it impossible for Jacobs to conceal his movements. Properly operating and monitored it would perhaps have made it impossible to conceal the whereabouts of the contraband. We conclude that the obtaining of this type of limited information is not a search within the mantle of the Fourth Amendment.

 If, however, it could be said that the monitoring of the "beeper" in the marijuana was a search within the meaning of the Fourth Amendment the court further concludes that there were exigent circumstances which justified such warrantless search. There can be no doubt that probable cause existed. The agents had observed the marijuana being loaded into the truck. Because of the truck's mobility it could be searched without a warrant in circumstances that would not justify a warrantless search of a house or office. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). It has long been recognized that a warrant is unnecessary for the search of an automobile on a highway where there is probable cause to support the search and "where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Events moved swiftly across Arkansas, Kansas and finally into Colorado. Until the 1971 Chevrolet departed upon the highway in Arkansas it could not be known for certain that this was to be the vehicle of delivery. After that it was too late to secure any warrant for a search by means of electronic surveillance. The use of the tracking equipment under these circumstances was reasonable.

The two cases relied upon by the movants, *United States v. Holmes*, 521 F.2d 859 (CA5 1975) and *United States v. Martyniuk*, 395 F.Supp. 42 (D.C.Or.1975) are inapposite. In *Holmes* the "beeper" was affixed by an actual trespass by a government agent to the defendant's van in a public parking lot. The van did not contain marijuana and there was no information that it was to be used to transport such contraband. It was installed for the purpose of permitting the agents to tail the defendant to the marijuana source. Here the "beeper" was not placed in Jacobs' truck by the government. It was for the purpose of tracking the contraband and not any individual. Here, when the "beeper" was monitored an actual crime known to the tracking agents was in progress.

In *Martyniuk* the government agents installed the "beeper" in a non-contraband item, a drum of caffeine, which was transferred to defendant's car. The court there found a reasonable expectation of privacy which was infringed because people may conceal their personal property for legitimate purposes. In the instant case, the "beeper" was placed in the contraband and there could not conceivably have been any possible legitimate purpose in the concealment of this contraband. Here a felony had already been committed in the officers' presence prior to the use of the device but in *Martyniuk*, there was no commission of a crime prior to the use of the "beeper". In both *Martyniuk* and *Holmes* the officers were "looking for" evidence and instrumentalities of crimes. In this case the officers had already discovered the evidence and instrumentalities of a crime and were merely seeking the identity of all those for whom the illicit goods were intended. They had the evidence of the crime and sought only to ascertain the criminal participants. Bank robberies are frequently monitored by electronic television cameras so that the identity of the criminal participants may be

known. It cannot reasonably be said that there is any constitutional right to keep one's identity unknown during the actual commission of a crime.

The movants do not contend, and the facts certainly do not support, that there was any physical intrusion by federal agents into the curtilage of the Jacobs' residence. It is their position that the warrantless visual intrusion into the curtilage was constitutionally condemned because the agents trespassed in taking up their observation point outside the curtilage. In *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) government agents who were trespassers on land outside of the curtilage observed the defendant and his associates pass a bottle of moonshine whiskey within the curtilage area. The court held that the eyewitness observations did not constitute an illegal search or seizure and that the special protection of the Fourth Amendment is not extended to the open field. The situation in our case is indistinguishable. *Katz v. United States,* supra, did not overrule *Hester.* In *Katz* there was an electronic intrusion into a place where the court found the defendant had a constitutionally protected reasonable expectation of privacy. The court did not then hold the Fourth Amendment applies as well to evidence obtained by hearing or sight by officers whose presence is not constitutionally forbidden. The doctrine of *Hester* retains its vitality. See e. g. *Air Pollution Variance Board of Colorado v. Western Alfalfa Corporation,* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974).

The cases cited by the movants as authority for the proposition that the view constituted an illegal search, *United States v. Holmes,* supra; *United States v. Davis,* 423 F.2d 974 (CA5 1970); *State of Texas v. Gonzalez,* 388 F.2d 145 (CA5 1968); and *Brock v. United States,* 223 F.2d 681 (CA5 1955), all involve a view obtained after actual trespass into the curtilage area. However, it is not unlawful for officers outside the curtilage to observe what occurs thereon. *Ramsey v. United States,* 278 F.2d 368 (CA 6 1960). In *United States v. Benson,* 299 F.2d 45, 46 (CA6 1962) the court in deciding that observations made by ATF agents constituted legal grounds for obtaining a search warrant said:

> "This issue was submitted to the district judge who found that the officers were not within the curtilage at the time they made their observations. They were within an area described as an island which was separated from Charles' residence by a creek three or four yards in width. On this island was an old hog pen, car body and an outhouse. There was no proof that Charles owned the island. In our judgment, it could not be considered part of the curtilage if he did. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; *United States v. Potts,* 297 F.2d 68 (CA 6); *Ramsey v. United States,* 278 F.2d 368 (CA 6); *Hodges v. United States,* 243 F.2d 281 (CA 5). We think this finding was supported by the evidence."

In a case very comparable to this case, ATF investigators entered onto defendant's land and made observations with binoculars of a small outbuilding located within the curtilage. The officers were stationed in an open field about 75 yards away. In ruling that the search was valid the court held:

> "Applying these principles to the present situation, it is of no significance that the object of the agents' observations was within the curtilage, so long as the observations were made from without the curtilage. The protection of the Fourth Amendment extends only to the curtilage, and observations made from without the curtilage thus do not violate the Amendment where they are made from an open field belonging to the defendant or from a public street."

*United States v. Sims,* 202 F.Supp. 65, 67 (E.D.Tenn.1962).

In *United States v. Campbell,* 395 F.2d 848 (CA4 1968) the defendant complained of the viewing by ATF agents from an adjacent cornfield of a transaction which took place in the backyard of the defendant's home and the court stated:

"The agents were not within the curtilage and the 'open field' doctrine is applicable to their observations. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; *United States v. Shue,* (4 Cir.) 385 F.2d 416; *McDowell v. United States,* (8 Cir.), 383 F.2d 599; *Rosencranz v. United States,* (1 Cir.), 356 F.2d 310; *United States v. Hassell,* (6 Cir.), 336 F.2d 684; *United States v. Young,* (4 Cir.), 322 F.2d 443; *United States v. Potts,* (6 Cir.), 297 F.2d 68; *Hodges v. United States,* (5 Cir.), 243 F.2d 281; *Care v. United States,* (10 Cir.) 231 F.2d 22; *Janney v. United States,* (4 Cir.), 206 F.2d 601. *Nothing said in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, requires a different result."* (Emphasis added.)

Further, apart from the application of the Open Field Doctrine which assumes that the officers had no right to be in the position to have the view, the court is satisfied that the observation of the agents is within the scope of the "Plain View" doctrine because the officers did have the right to be where they were. When the officers made the entry upon Jacobs' land they were in hot pursuit of known contraband. As we have said, a crime was being committed in their presence. If they had stopped at the gateway the contraband may very well have been lost and the participants in the crime gone unidentified. A delay in their investigation at this point could have rendered futile all of the careful and painstaking efforts that had preceded their arrival at the farm. The court does not believe that the Fourth Amendment dictates such a result and "under the circumstances of this case the 'exigencies of the situation made that course imperative'." *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967).

■ It has been pointed out:

"When the performance of his duty requires an officer to enter upon private property, his conduct, otherwise a trespass, is justifiable."

*United States v. Knight,* 451 F.2d 275 (CA5 1971). Clearly, the officers in this case had

a duty to assure that the marijuana did not disappear and the dealers escape. The threatened removal or destruction of contraband may justify a warrantless entry. See *United States v. Garnes,* 258 F.2d 530 (CA2 1958), cert. denied, 359 U.S. 937, 79 S.Ct. 651, 3 L.Ed.2d 637; *United States v. Volkell,* 251 F.2d 333 (CA2 1958), cert. denied, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1068; *Ellison v. United States,* 93 U.S.App. D.C. 1, 206 F.2d 476 (CA D.C. 1953). In *United States v. Davis,* 461 F.2d 1026, 1030 (CA3 1972) the court summarized:

"The fourth amendment protects only against unreasonable searches and seizures. It, therefore, requires the police to obtain warrants only when they have time and opportunity to do so without obstructing their efforts to apprehend criminals and evidence or fruits of their crimes. Therefore, when officers are in 'hot pursuit' of a criminal, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), when they 'stop and frisk' *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or when their attempt to secure a warrant might delay them sufficiently to cause the criminal to get away or destroy the fruits or evidence of his crime, *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *United States ex rel. Cardaio v. Casscles,* 446 F.2d 632 (2 Cir., 1971); *United States v. Titus,* 445 F.2d 577 (2 Cir., 1971), they may proceed without a warrant."

Therefore, the officers who were following the contraband which was then possessed by defendant Jacobs could justifiably enter upon the farm without a warrant. When they assumed their viewpoint overlooking the house they were in a place where they had a right to be. Thereafter, their observations of those activities in plain view did not constitute a search. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

■ Finally, assuming there was any illegality in the installation and use of the tracking device it has not tainted any evi-

dence which movants seek to suppress. The "fruit of the poisonous tree" doctrine has never, from its inception been applicable in those situations where the knowledge or possession of the challenged evidence has been obtained from a source independent of the government's wrongful acts. *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). If there was any impropriety, the evidence in question certainly did not come about "by exploitation of that illegality". From its entry into the United States until its arrival at the farm the whereabouts of the marijuana was known to federal agents because of their personal observations. After the loaded 1971 panel truck left the barn near Goshen, Arkansas it was always kept in sight by trailing agents. At no time did they ever lose ground contact with the vehicle. The electronic surveillance was never a necessary factor in ascertaining the whereabouts of the contraband. This further distinguishes this case from *Holmes v. United States,* supra, and *United States v. Martyniuk,* supra, relied upon by movants, for in each of those cases the subject was able to slip away from the visual surveillance and officers would have been unable to follow without using the "beeper". In this case the result would have been exactly the same if the "beeper" had never been installed. The "beeper" here was completely superfluous to the actual visual surveillance which guided officers across the country to the Colorado destination. The means used was clearly distinguishable from the complained of illegality. In sum, the connection between the allegedly illegal "beeper" and the legal search was "so attenuated as to dissipate the taint". *Nardone v. United States,* supra at 341, 60 S.Ct. at 268.

Accordingly, the Motions to Suppress by the defendants Jacobs and Brutico will be denied.

IT IS SO ORDERED.