**UNITED STATES of America**

**v.**

**Paul BLOCK.**

**Crim. No. 80–393–MC.**

United States District Court,
D. Massachusetts.

Sept. 9, 1981.

John LaChance, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Nancy Gertner, Boston, Mass., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION TO SUPPRESS

McNAUGHT, District Judge.

The defendant, Paul Block, moves to suppress the fruits of a search of a green GMC camper truck and the sailing vessel "Shango", both of which were owned by and registered to him. The searches took place on the morning of July 15, 1979.

At 9:00 A.M., July 14, 1979, Sgt. William Brooks, an officer with ten years experience on the Wellfleet Police Department, received a complaint at his home by telephone. The caller was Mrs. Robin McKay, a resident, with her husband, of the Blackfish Creek area. She reported that she heard motorboats in Blackfish Creek between 2:30 and 4:30 A.M. A boat was said to have made a number of trips up the creek at one-half hour intervals. Sgt. Brooks, at the home of the McKays later in the morning, was also told by Mr. McKay that he had heard the sound of an anchor drop and that one could hear things being dropped and splashed in the water. A follow-up investigation revealed that, in front of the Must house, about 150 feet from the McKay house, grass was matted down near the water line. This situation was noted by Sgt. Brooks and by Officer John Brintnall at about 2:30 P.M. Sgt. Brooks had been told by Mrs. McKay that there had been a red pick-up truck parked in the Must house yard.

When the sergeant and the officer returned to the station, the sergeant filed an incident card and posted a bulletin board notice relating to the suspicious activity in Blackfish Creek. The sergeant testified before me that the notice referred to smuggling activity; I accept his testimony to this effect although he did not recall at an earlier hearing before another judge on these motions having referred to possible drug smuggling.

At about 4:20 A.M. the next morning, July 15, 1979, a radio call from the Wellfleet police station dispatcher was received by three officers of the Wellfleet Police Department (Officers Parker, Palmer and Lewis). The message was: "McKay residence—same thing." The three officers proceeded immediately to Freeman's Point, where one would ordinarily make observations of Blackfish Creek. The vehicle in which they were traveling went by the driveway which led to the Must and McKay houses, but foliage and fog probably played a part in the fact that they noticed nothing in particular.

At Freeman's Point, the officers went to the edge of the creek. Lying in the grass, their powers of observation were limited. Officer Parker did, however, see a sailboat, a large two-masted one, and a smaller boat alongside it, with people passing items back and forth between the two boats. Officer Palmer saw two boats next to the sailboat. They both heard muffled voices. Lewis made similar observations. The smaller boats headed up Blackfish Creek toward Route 6, the main highway, the same direction where the Must house was located. Mr. Freeman told Officer Parker that the same people had been out there the night before bringing items in. The material being loaded on the smaller boats appeared to be "blocks" of some type. The officers called Sgt. Brooks to bring in a back-up unit and went back onto Route 6 to the area where Blackfish Creek joins it. In doing so they passed by the Must house. At Route 6 the three officers met Sgt. Brooks and told him what they had seen and heard. The four now decided to go to Old Wharf Road, a point at the southernmost end of Blackfish Creek. Upon arrival Officer Parker walked down to the creek and saw the same smaller boat, which he said had previously left the sailboat, now heading back toward the sailboat from the direction of Route 6. The boat was not loaded with blocks. Officers Palmer and Lewis did not make these visual observations but they did hear at least one voice say that the sailboat was stuck.

The policemen then held a conference, following which they went directly to the Must house, with Officers Parker and Palmer in the lead vehicle, and Sgt. Brooks and Officer Lewis in the second. They parked on Cannon Hill Road, blocking the driveway to the Must house. Officer Parker walked down the Must house driveway, gun drawn. He was in police uniform. He saw a man come out of the house, look at him, then run between the house itself and a 1978 light green GMC pick-up truck with a camper back. Officer Parker lost sight of the man when he turned the corner between the house and the vehicle. A woman then came out of the house and began to run to another vehicle. Parker apprehended the woman, at the same time calling out to Sgt. Brooks that the man had run toward the rear of the camper. Officer Palmer observed the man run between the house and the camper and then heard him running through the marsh. Sgt. Brooks saw Officer Parker detaining the woman, so he ran between the house and the camper with gun drawn. Reaching the back of the camper, he did not see the man and did not hear anything. He testified, and I find, that he believed that the individual had gone into the camper. He opened the camper door and came upon a quantity of marijuana residue and bales. The sergeant yelled that he had discovered the marijuana. He then saw Officers Palmer and Lewis pursuing the fleeing subject across the marsh.

Officer Lewis, having gotten out of the vehicle after the sergeant, while running down the driveway toward the McKay house, saw a person going into the woods, and he ran into the woods thereafter. This officer helped in arresting one Milham in the marsh.

After the search of the camper, a red pick-up was also searched. I find as fact that the officers who made these searches were then looking for any additional suspects and were concerned that weapons might be involved.

Before 5:11 A.M., Officer John Brintnall received a telephone call at his home. He was asked to report to the police station, there to meet Officers Dath and Chapman. He met them on the station steps and was told that they were to obtain a boat, go to Blackfish Creek and look for a particular sailboat. They obtained a vessel. En route to Blackfish Creek, the officers received a communication from Officer Parker. They were told to look for a two-masted sailboat in the creek area; that "there was a possibility there was a marijuana drug investigation going on at that time". Upon arrival in the Blackfish Creek area, which was quite foggy, they saw the two-masted sailboat and two smaller boats, a Boston Whaler and a rubber raft. The smaller boats

were headed away from the sailboat, with two individuals in each of them. The officers were not in a police boat, but in Officer Chapman's father-in-law's boat. A person in one of the smaller boats asked what time the next high tide was. Now, while coming into shore, the officers received a radio transmission advising that the two pick-up trucks found at the Must house were loaded with marijuana. The raft and the Whaler landed on shore, followed by the officers. Chapman was in uniform. Dath was wearing a police jacket. Brintnall was wearing a visible badge. Chapman called out to the four: "Stop, we want to talk with you." The defendant, Block, told Officer Brintnall that he was not going to run. Officers Chapman and Dath took off after the other three. Brintnall saw the substance which appeared to him to be marijuana on the Whaler and on the raft.

The area where these events occurred was so foggy that the officers did not know exactly where they were. Officer Brintnall placed Paul Block under arrest, marched him to a Pleasant Point Road, a tarred road, and called for a cruiser from the Town of Truro. They came down and took the defendant Block away. Next Brintnall returned to the Whaler and to the raft, where Officer Chapman had already returned. None of the other three persons had been apprehended. Observations were then made of the two-masted sailboat. It was about 50 feet from shore and was aground with approximately four or five feet of water beneath it. Using Officer Chapman's father-in-law's boat, they went alongside the "Shango". They could see "the rails and the deck of the boat", and observed on them a brown leafy substance.

I find as fact that high tide had occurred at 4:34 A.M. that morning. It was now approaching 6:00 A.M., and it was a moon high tide. The "Shango" was hard aground on a sandbar, in a shallow creek, where Officer Brintnall knew that he had never seen a sailboat of that size in the area before, and the officer knew or should have known that the vessel could not be refloated for another approximately 12 hours. Officer Brintnall was an assistant harbormas-

ter and knew that there was deeper water in the channel about 15 to 20 feet further away from shore from the point where the sailboat was aground. He did not know how much deeper that channel was. Unless there was outside aid, nothing could be done to free the "Shango" until the tide came in. Officer Brintnall testified: "There was a possibility that someone else might be on board, and I made the decision to go out and see if there was anyone else on board." No one was seen aboard the vessel when the police officers on the boat came alongside the "Shango", nor were any lights observed. No noise was heard. Officer Chapman boarded the vessel and tied the Chapman boat to the "Shango". Officer Brintnall boarded the "Shango" and the officers proceeded to the closed, but unlocked, hatchway. Chapman pushed back the hatch and Officer Brintnall saw the brown leafy substance from bales that had broken open. There was no one else aboard.

The defendant Block's motion, as it is directed to the opening and search of the 1978 GMC camper, is denied.

▮ As established in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), a warrantless entry onto the premises in hot pursuit of a suspect for whom probable cause to arrest exists provides sufficient "exigent circumstances" for dispensing with the warrant requirement of the Fourth Amendment. In this instance there was probable cause to arrest or detain the male in flight by reason of information sufficient to warrant a prudent person to believe that the person in flight had committed an offense. The information which Sgt. Brooks received from Mrs. McKay regarding unusual activities during the early morning hours in the Blackfish Creek area near her home, his observations by the creek near the Must house, and the information relayed to him concerning his fellow officers' observation of persons unloading materials from a two-masted large vessel into a smaller one which departed in the direction of the Must property, in combina-

tion with the flight of the man and woman from the house upon seeing the officers, established probable cause to believe that the fleeing male was engaged in an illegal smuggling operation.

The "plain view" doctrine may be invoked where a law enforcement official is lawfully in a position where evidence of a crime is immediately apparent and its discovery is inadvertent. *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–2414, 57 L.Ed.2d 290 (1978); *Coolidge v. New Hampshire*, 403 U.S. 443, 465–466, 91 S.Ct. 2022, 2037–2038, 29 L.Ed.2d 564 (1971). Here Sgt. Brooks entertained a reasonable belief that a male suspect had gone to the rear of the camper, by reason of Officer Parker's alert. He saw no one outside the camper when he rushed there in pursuit. The sergeant had a right to open the rear of the camper and he was, therefore, legitimately in the position from which he viewed the contents. Once the camper had been opened, the marijuana residue and bales, as well as their incriminating nature, were immediately apparent. In the course of looking for the fleeing suspect, his discovery of the marijuana was inadvertent. In view of these circumstances, I conclude that the application of the "plain view" rule is proper in this instance. In summary, there were exigent circumstances which justified the opening of the rear door of the camper without a warrant, as Sgt. Brooks was in hot pursuit of a suspect and reasonably believed he had entered the rear of the camper. Upon the opening of the door, the contraband was in plain view, and its discovery and seizure were, therefore, lawful.

I arrive at a different conclusion, however, with respect to the warrantless search of the "Shango". Here the motion to suppress must be granted. I cannot agree with the government's contention that the automobile exception to the warrant requirement excuses the failure to obtain a warrant prior to the search or that exigent circumstances existed which rendered the search lawful.

The Supreme Court has treated the search of motor vehicles differently from the search of other premises in part because of their inherent mobility, and in part because there is a diminished expectation of privacy in vehicles which travel upon public thoroughfares, whose occupants and contents are in plain view, and which are routinely inspected and subject to substantial regulation. *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). The Court of Appeals for this circuit has cautioned that not all the "doctrinal gloss applicable to automobiles is applicable to boats". *United States v. Miller*, 589 F.2d 1117 n.3 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). The particular circumstances surrounding the search of a vessel must be examined in each instance in order to determine the reasonableness of the search under the Fourth Amendment. *See United States v. Zurosky*, 614 F.2d 779 (1st Cir. 1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Miller, supra.*

Of great significance to the court in this case is the fact that the "Shango" was aground on a sandbar in a shallow creek. I note parenthetically the sentence in *United States v. Block*, 636 F.2d 1197 (1st Cir. 1980): slip op. at p. 3. "As they left shore (the police officers), they realized that it was aground on a sandbar and would not be able to float off for five or six hours." The evidence before me would warrant a finding of a time period closer to twelve hours. There was indeed probable cause to believe that the "Shango" had been involved in a marijuana smuggling operation. Of course, there was a possibility that someone might have been left aboard the boat, although the absence of noise and the absence of light would tend to establish the opposite in the mind of a reasonable person. Contrast *United States v. Johnson*, 561 F.2d 832 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1076, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1978) (warrantless search of a building upheld where numerous persons who could have destroyed evidence had been observed in building housing narcotics operation). There was a possibility that with outside help the "Shan-

go" might have been moved before the next tide, but the probabilities were that the boat could not be refloated for another twelve hours. No evidence was presented to the court concerning how much delay would be incurred by reason of the procurement of a search warrant. It would seem that the immovable object which the boat had become could have been watched and protected very easily as the tide receded. Eventually, one could walk from shore to the vessel.

The government also argues that if there were someone aboard, that someone might dispose of evidence (presumably the marijuana left there, or ship's documents), but we deal once again with possibilities only. There was no evidence pointing to a probability that there was anyone aboard or even likely to gain entry on board from either the shore or the water. As distinguished from a case such as *United States v. Brown*, 457 F.2d 731 (1st Cir. 1972), where the court held that the approach of nightfall, the location of numerous stripped vehicles in the woods, and the likelihood of other persons being involved in the theft and receipt of vehicles were circumstances justifying a warrantless search, these officers came upon the "Shango" in the early morning hours and had the advantage of greater visibility throughout the day. It seems there should have been ample time to obtain a warrant under circumstances where it was unlikely the boat could be moved or that persons who had fled the area would return.

The government points to the case of *United States v. Hensler*, 625 F.2d 1141 (4th Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), where the court concluded that a grounded sailboat with no anchor or any moorings was "quarry both to storm and stealth, to be carried out to sea or to the bottom, or towed to a more ready location for the discharge or dispensing of drugs." 625 F.2d at 1143. The particular facts of that case are not

discussed in great detail in that opinion, and there is no basis for the conclusion that the "Shango" was anything but remotely subject to destruction or departure.[1]

Of further significance is the nature of the "Shango" as compared to that of a typical automobile. The size of the "Shango" and its use as a temporary residence entitled its occupants to a greater expectation of privacy than would ordinarily exist in connection with an automobile. While the court in *United States v. Miller, supra*, commented that "[a] boat, like an automobile, carries with it a lesser expectation of privacy than a home or an office," it must be observed that its analysis was based on the search of a yacht which had been abandoned at another person's mooring and was fouled in its lines, suggesting the possibility of a drowning. Similarly, in *United States v. Zurosky, supra*, the court attached significance to the vessel's status as a commercial scalloping boat in concluding that the boat's owner had a lesser expectation of privacy in his vessel than in a home. 614 F.2d at 789 n.13.

Taking into account the totality of the circumstances which existed at the time the officers searched the "Shango", I conclude that the automobile exception to the warrant requirement cannot be applied in a blanket fashion to the search of the "Shango" and that no exigent circumstances existed which rendered the search of the vessel lawful.

---

1. If, as defendant suggests, the court in *Hensler* applied the automobile exception to the search of the vessel in a *per se* fashion, its precedential value is questionable in view of the hesitancy of the Court of Appeals for this circuit in applying broadly the motor vehicle exception to the search of vessels.