**UNITED STATES of America,**

v.

**Lorenzo SPENCER, Defendant.**

**No. CR 81–00391(S).**

United States District Court,
E. D. New York.

Sept. 10, 1981.

E. R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. by Peter Norling, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Mahler & Harris, P. C., Kew Gardens, N. Y. by Stephen Mahler, Kew Gardens, N. Y., for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

Having been indicted and then reindicted for alleged violations of 18 U.S.C. § 2113(a) and (d), bank robbery, Mr. Lorenzo Spencer has moved to suppress physical evidence discovered during a search of his residence and statements he made subsequent to his arrest. This Court held a hearing on July 29, 1981, to consider these issues and finds the following to have occurred:

On May 19, 1981, at approximately 5:15 PM, New York City Police Officer Thomas

Van Pelt was on radio car patrol with another New York Police Officer, Sergeant Eagen, when a young female flagged down the car at 116th Avenue and Barron Street in the Borough of Queens (Tr. 5–6). This young lady, who was later identified as Ms. Dena Hogan, told the officers that she was living with a friend who kept guns in the house and that she wanted them to go and remove the guns because she was afraid that her child would find the weapons and hurt himself (Tr. 7).

Obviously needing more information, the officers asked whether the friend was at home now and Ms. Hogan responded in the affirmative. The officers then told her that "if we go in and the guns are there, we are going to have to arrest him. We are also going to have to have her as the complainant." Ms. Hogan balked at that suggestion, stating that she did not wish to get involved. (Tr. 7).

Sergeant Eagen next asked Ms. Hogan if her friend was in trouble and she replied that "He had something to do with banks." The Sergeant then inquired whether there was a warrant outstanding for his arrest but Ms. Hogan did not know. Further questioning revealed that her friend's name was Lorenzo Spencer, that her name was Dena Hogan, that Mr. Spencer's date of birth was January 5 and that he was 21 years old (Tr. 8). Ms. Hogan also informed the officer that the address at which she resided with Mr. Spencer was 155–64 116th Drive in Queens (Tr. 8).

Immediately after this conversation took place, Officer Van Pelt returned to the station house and ran the name Lorenzo Spencer and his date of birth through the police computer to see if there were any outstanding warrants for his arrest. The computer indicated that there was an active warrant outstanding but that Central Warrants should be called to verify that fact. Central Warrants did indeed confirm that there was an active bench warrant out for Mr. Spencer's arrest (Tr. 9).

Soon thereafter, Officer Van Pelt and Sergeant Eagen drove to 155–64 116th Drive. There they waited for two officers from the warrant part to assist them in the arrest of Mr. Spencer. When these officers arrived they approached the front door of the premises at that address. After wending their way through a number of dogs, the officers reached the front of the building where there were two doors. They knocked on one of the doors, asked if Lorenzo Spencer lived there, and, discovering that he did not, moved over to the next door (Tr. 10–11).

That second door was apparently wide open and the officers walked in and went upstairs where the living quarters of that apartment were located. When these four officers reached the top of the stairs, an elderly man approached them and in response to the officer's question responded that Mr. Spencer did live there but that he did not know whether he was in right now. The man then indicated that Mr. Spencer lived in a room at the back of the apartment whereupon the officers carefully made their way back to that room (Tr. 11–12).

When the officers reached that last room, they carefully checked under the bed, behind a large dresser and in the closet to see if Mr. Spencer was hiding anywhere within. The closet itself was rather small but there was an opening at the top which led to the attic which was subsequently checked out by other officers called to the scene (Tr. 14). The officers did not discover Mr. Spencer but in the closet, in plain view was a black plastic bag out of which stuck a couple of gun barrels (Tr. 12). With his curiosity aroused by this sight, an officer opened the top of the bag a bit and saw the stock of a rifle and other assorted items. The officer then took the gun from the bag and moved the bag out of the closet to get a better look at the contents (Tr. 12–13).

In the bag was a loaded thirty caliber carbine, a loaded twenty-two caliber revolver, an unloaded thirty-two caliber semi-automatic, a device to remove locks from automobiles, two ski masks, rubber gloves, various savings bonds, and a signal stat which is a rotating red light for use on emergency vehicles (Tr. 13, 26–27). All of

this was taken by the police officers when they left the premises which was shortly after the attic had been searched to see if Mr. Spencer was hiding there.

The next part of the hearing concerned the arrest of Mr. Spencer on June 25, 1981, by the FBI. Pursuant to an arrest warrant issued by a magistrate of this Court, Agent James Ellis placed Mr. Spencer under arrest outside of 172–05 111th Street in Queens. Agent Ellis advised Mr. Spencer of his rights and then transported him back to the FBI office for processing (Tr. 29–31).

At the FBI office Mr. Spencer was again advised of his rights, which he said he understood, and was shown the complaint outstanding against him. That complaint charged him with armed bank robbery (Tr. 31–32). Upon reading it, he said "I never done it. I wasn't never in no bank so I couldn't have done no bank robbery." He further added that "I never been in the Astoria Federal Savings Loan, I don't even know where one is." (Tr. 33).

## DISCUSSION

The issues presented by this motion are relatively clear: (1) May the police, in attempting to execute an arrest warrant enter a residence of the suspect when they have a reasonable belief that he is present therein and, during the course of that entry, search for the suspect and seize incriminating objects which are discovered in plain view during the course of that search for the suspect? and (2) were defendant's statements, knowingly, voluntarily and freely made?

■ No argument can be made at this date that the police may not enter into a person's place of residence to execute an arrest warrant for that person. The Supreme Court has reiterated this rule just recently.

If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his home to the officers of the law.

*Payton v. New York*, 445 U.S. 573, 602–603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980); *see also Steagald v. United States*, —— U.S. ——, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).[1] If the suspect is not believed to be at home, however, the entry and subsequent search of a residence would not appear to be proper. *See United States v. Manley*, 632 F.2d 978 (2d Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Yet, in the instant case, the police officers could reasonably believe that Mr. Spencer was at this residence because his girlfriend, Ms. Hogan, told them that was the case and because the elderly man met at the top of the stairs did not indicate otherwise. Consequently, the entry into the residence and search for the suspect therein were proper. *See id.* at 983–984.

Finding that the entry and search for the suspect were proper under the Fourth Amendment also leads us to conclude that the search of the closet and seizure of the incriminating evidence were also proper under the "plain view" exception. *See Harris v. United States*, 390 U.S. 234, 80 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

■ That exception holds that seizure of physical evidence within the "plain view" of officers who are legitimately in a position to obtain that view is permissible if the incriminating nature of the articles is readily apparent and the discovery of the items is inadvertent. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). As we have already stated, the search of the house for the suspect was proper. Furthermore, under a bed and in a closet are two obvious places where a person could hide and there is no reason to bar

---

1. We should add that we place no credence in defendant's argument that the bench warrant issued for his arrest by a State Court upon his failure to appear for a criminal proceeding did not permit entry into his residence to search for him. A bench warrant in New York State Courts, as well as in Federal Courts, issues to secure the presence of the defendant; it gives law enforcement officials the power to seize that defendant and bring him to court. No more and no less was attempted to be done here.

the police from looking there once they are properly in the residence. The second requirement that the incriminating nature of the items be readily apparent is also met in this case. The discovery of a rifle barrel in a closet of the room occupied by a suspect clearly signifies that something is not as it should be. It should be noted that all "long barrelled rifles" must be registered in the State of New York and that possession of a non-registered weapon constitutes a criminal violation. Discovery of such a weapon, in "plain view" then could possibly constitute a crime. Discovery of such a weapon in a room occupied by a fugitive, who is possibly connected with a bank robbery, raises even a greater question of the propriety of its possession.

■ The third requirement, that the discovery be inadvertent, means essentially that the police cannot use the "plain view" exception to circumvent the warrant requirement when they had probable cause to know that the items would be where they were found. *See United States v. Liberti*, 616 F.2d 34 (2d Cir. 1980); *United States v. Hare*, 589 F.2d 1291 (6th Cir. 1979).

Here the police did not have probable cause to believe that they would find the rifle in plain view. They may have thought that there was a possibility that they were not hidden in the residence because of Ms. Hogan's statements, but Ms. Hogan did not tell them where the guns were. In such a case, the "inadvertence" requirement is satisfied and the search will be upheld. *See United States v. Liberti, supra; State v. Pepe*, 176 Conn. 75, 405 A.2d 51 (Conn.1978).

■ Having found that the seizure of the rifle itself was valid, the subsequent search of the bag out of which the rifle protruded should also be found valid for it is beyond contention that a police officer discovering a dangerous weapon protruding from a sack may look into that sack to see if any other dangerous items are within. Common sense alone dictates that the rifle would have to be examined to see if it was loaded, and therefore dangerous. This case does not present a search of a closed container or a suitcase; rather, it is the search of an open bag which clearly contained a dangerous weapon. Such "exigent circumstances," if they can properly be so denominated, clearly justify the examination of all of the contents of the bag. *Cf. Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

■ As to that part of defendant's motion to suppress statements made to the FBI agent after his arrest and after twice being read his rights, there is no evidence to indicate that the statements were other than knowingly, voluntarily and freely made.[2] Defendant indicated he understood his rights; there was no coercion or physical abuse and the fact that the statements made were apparently exculpatory statements, perhaps false, indicates to this Court that the defendant knew full well what he was saying and did so freely.

Therefore, on the basis of the foregoing, defendant's motion to suppress both physical evidence and his own statements must be, and hereby is, denied.

SO ORDERED.

---

2. Defendant, in his brief, has belatedly attacked the validity of the arrest warrant issued by a Magistrate of this Court. The affidavit sworn to by the FBI agent, Exhibit # 2, alone generates probable cause by the statement that a fingerprint found at the scene of a bank robbery was that of Mr. Spencer.