**UNITED STATES of America**

v.

**Joel MEDOWS, Defendant.**

No. 81 Cr. 777.

United States District Court,
S. D. New York.

May 26, 1982.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City (Morris Weinberg, Jr., Asst. U. S. Atty., New York City, of counsel), for the Government.

Roger Bennet Adler, New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Defendant's motions (1) for an order directing additional pretrial discovery; (2) for *in camera* inspection of the Grand Jury minutes; (3) to dismiss the indictment or, alternatively, to consolidate Counts One through Nineteen into five counts and sever Counts Twenty through Twenty-eight; and (4) to suppress evidence seized from defendant's law office, are denied. Fed.R.Crim. P. 6, 8, 12, 14, 16.

## FACTS

The indictment in this case charges defendant, a practicing attorney, with nineteen counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, 2 (Counts 1–19), nine counts of aiding and abetting the submission of false statements to obtain Social Security cards, 18 U.S.C. §§ 1001, 2 (Counts 20–28), one count of forgery and alteration of documents relating to the registry of aliens, 18 U.S.C. §§ 1426(a), 2 (Count 29), and one count of selling and disposing of forged documents relating to the registry of aliens, 18 U.S.C. § 1426(b) (Count 30).

In essence, defendant is charged with operating a scheme whereby he promised, for a fee, to obtain "employment authorization" for nonimmigrant aliens, which would allow them to remain in the United States and work pending an application for permanent resident alien status. The Government claims that defendant knew that none of these nonimmigrant aliens were entitled to "employment authorization" under the immigration and naturalization laws. The Government also charges that defendant prepared and caused to be prepared false Immigration and Naturalization Service ["INS"] rubber-stamp impressions on certain INS I–94 forms and the aliens' passports. Defendant's purpose in causing such false "employment authorization" endorsements, according to the indictment, was that the fraudulent documents would be used by the aliens to work and remain illegally in the United States. Finally, the indictment charges that defendant aided the aliens involved in presenting the falsified documents to the Social Security Administration in support of applications for Social Security cards.

Beginning at 9:00 a.m. on April 8, 1981, INS Criminal Investigator Andrew C. Simon and four other INS agents searched defendant's law office at 551 Grand Street

in Manhattan pursuant to a search warrant issued on April 6 by Magistrate Sinclair.[1] The agents' primary objective was to locate a counterfeit INS "employment authorization" rubber stamp. They also sought an appointment book and office diary, some black pens, and various documents relating to the immigration status of sixteen Filipino nationals whose names were set forth in an exhibit to a rider attached to the warrant. The rider mentioned the following specific property to be seized:

> An immigration employment authorization stamp; a stamp pad (blue/purple ink) and other containers of blue/purple ink; a pen desk set (black ink) and any other black ink pens; an appointment book and office diary for period prior to 4/6/81; blank immigration forms; all records and documents relating to the immigration status or INS work status or any immigration petition, document or utterance filed in behalf of and relating to those Philippino [sic] Nationals listed on Exhibit A to this "Rider," including receipt book entries and other records of office receipts and payments for services rendered in connection therewith.[2]

Defendant was alone in the office when the agents arrived. After defendant read the search warrant, Simon asked him if he would assist the agents in locating the items set forth in the rider. Defendant declined and the agents commenced the search. The office consisted of one room, approximately thirty by fifteen feet, and contained filing cabinets, shelves, office machines, law books, two desks and a television set. One agent took several photographs of the premises before the search began showing the contents of the office. Simon testified and the photographs show that hundreds of papers and other documents were strewn about the office, especially on defendant's main desk.[3]

The Court credits the testimony of Agent Simon with respect to the manner in which the agents conducted the search. Simon testified that he and one other agent first searched defendant's main desk in its entirety, and then searched several metal and wooden filing cabinets next to the desk. The cabinets contained hundreds of legal-size files, some with names written on them and some without. Simon either reached into or tapped the outside of the files with names looking for the employment authorization stamp, which he thought would be approximately one and one-half inches wide with a one and one-half inch handle. He did not read the documents inside those files. If, however, a file had no name, he glanced at its contents until he could determine to whom it related.[4] Simon seized just two files from the cabinets, each of which bore the name of an alien listed in the rider to the warrant. He did not find a rubber stamp.

Simon next searched the smaller second desk, then glanced behind a few of the law books on the shelves, looked behind the furniture and sifted through the trash in

1. Simon submitted a detailed affidavit and photocopies of original evidence in support of the Government's application for a search warrant. At a hearing conducted on February 10, 1982 on defendant's suppression motion, the Court found that the affidavit and materials submitted therewith established sufficient probable cause for the issuance of the warrant. Transcript of Hearing at 3 (Feb. 10, 1982) [hereinafter "Tr."]. Moreover, defendant made no showing at the hearing that the affidavit contained false statements known to the Government to be false. See Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

2. The sixteen Filipino nationals were: Reynaldo Guerra, Corazon Guerra, Richard Guerra, Anna Guerra, Consorcia Caamic, Manuel P. Posadas, Jr., Editha Posadas, Vanessa Posadas, Manuel P. Posadas, Sr., Rene Manalo, Joselito DeVera, Eymard Rodriguez, Arlene Kodumal, Gemma Escanlar, Carolun Quesada, and Anthony Quesada.

3. Tr. at 8; Government's Exhibit 33–8 to 33–12, 33–19, 33–22 [hereinafter "GX ___"].

4. Defendant testified at the hearing that Simon looked at every piece of paper in nearly every file in the filing cabinets. He also testified that there were "hundreds of files" and that Simon spent a "minute or so" looking at each piece of paper. Tr. at 103–05. The Court finds that this testimony is not credible. Common sense dictates that at this rate it would have taken Simon days to look through the files.

the garbage pail. In the course of the three and one-half hour search, thirty-two items were seized and listed in an inventory,[5] although the employment authorization stamp was not found. The thirty-two items included an appointment book, some black pens, several blank immigration forms, and various documents and papers relating to several of the aliens named in the warrant as well as to a number of other aliens not named in the warrant. Most of the items were found on top of defendant's main desk and were not covered except perhaps by other documents strewn about the desk. Simon testified that neither he nor any other agent opened any sealed envelopes during the search or seized any item contained in a sealed envelope.[6] And except for the two legal files, the agents did not remove anything from the filing cabinets.

When asked how he determined whether to seize a particular document, Simon testified:

A. If the document contained one of the names of the aliens mentioned in the rider to the warrant, I seized it.

Q. With regard to those documents that did not contain names of the aliens that ... are mentioned in the rider, what process did you go through in order to determine that that was a document that should be seized pursuant to your search?

A. In reading the document, the documents of some of those letters and forms indicated to me that it was evidence of the very same crimes that we were investigating, and I made a determination to seize it.[7]

Simon further testified that when he commenced the search, he was not looking for documents relating to aliens whose names were not contained in the rider to the warrant.[8]

Items 1, 3, 4, 5, 8, 11, 12, 14 (I–130 form), 15, 16, (completed I–130 form), and 17 through 25, are documents or objects either specifically identified in the search warrant or containing the names of aliens named in the warrant. All were found on top of defendant's main desk.[9] Item 27 was found in one of the main desk's drawers and was identified by defendant as his appointment book. The search warrant expressly calls for the seizure of an appointment book. Item 32 was found on top of the second desk and contains the name of an alien named in the warrant.[10]

Items 2, 6, 7, 9, 10, 13, 14 (I–551 form), and 16 (blank I–130 forms), were also found on top of defendant's main desk, but apparently relate to aliens whose names were not mentioned in the search warrant. Items 28 and 31 were found on top of the second desk and also relate to aliens whose names were not listed in the warrant. Finally, item 26, a passport, was found in the center drawer of the main desk. As depicted in one of the photographs, the drawer was

---

5. GX 1 through GX 32 correspond to the thirty-two items seized, in the order listed in the inventory.

6. Tr. at 87–88. Defendant testified that Simon directed him to open sealed mail that was either on his desk or delivered that morning. Tr. at 98. He testified on cross-examination that one or two of the items seized came from sealed letters, but he could only identify one such document—item 2, which is a letter dated February 6, 1981 and apparently mailed from the Philippines. Even allowing for slow mail delivery, as claimed by defendant, Tr. at 102, it seems unlikely that this letter did not arrive until April 8, the day of the search. Therefore, the Court has disregarded defendant's testimony in this area.

7. Tr. at 22.

8. Tr. at 92.

9. Defendant has not moved to suppress item 5 or the I–130 portion of item 14. Defendant *has* moved to suppress an I–551 form, which is also part of item 14. Item 8 is not in dispute because the Government has represented that it will not offer it into evidence at trial. Item 16 contains a completed rough draft of an I–130 form in the name of Rene Manalo, which defendant has not moved to suppress. It also contains two blank I–130 forms signed by George Manalo, whose name appears on the completed I–130, which defendant *has* moved to suppress.

10. Items 29 and 30 are the two files Simon seized from the file cabinets. Defendant has not moved to suppress these items.

partially open when the agents commenced the search, and the passport was visible.[11]

With respect to each document relating to an alien not mentioned in the warrant, Simon explained why it was seized. Item 2 is a letter from R. G. ("Ricky") Fontanilla to defendant, dated February 6, 1981. Referring to a person named "Lito," Fontanilla writes:

> He mentioned to me about tourist who would like to go there and if they want to stay there and look for a job and get a social security card, you could facilitate their passport by stamping something on their passport that they cannot be deported. Lito, mentioned about the fee of $700.00, and I'm charging here an additional of $300.00 to be paid in pesos, while the $700.00 will be paid there after the work has been accomplished. Could you please explain to me about these procedure as right now we have four prospects here who are willing to go there by the end this month and next month too.[12]

Simon testified that he believed the letter "referred directly to the very same crimes that we were investigating. Therefore I seized it." [13]

Item 6 is an INS G–325 form made out in the name of Francisco Quesada. A G–325 form is submitted in conjunction with a petition for naturalization. Simon had previously been advised by Arlene Kodumal, whose name appeared on the warrant,[14] that Quesada was her father and that defendant had filed citizenship papers on Quesada's behalf. Simon seized it because he believed it should already have been filed.[15]

Item 7 is a letter dated November 23, 1980, asking defendant to "[p]lease arrange to return *stamped* authorized passports to their owners," and listing two names and

phone numbers.[16] Although Simon did not know these individuals or think they were Filipino aliens, he seized the document because it "was evidence of the very same crimes that we were investigating relating to the employment authorization stamp." [17]

Items 9 and 31 are INS I–130 forms filled out in the names of Vera A. Concepcion and Ma. Lucila V. Bunuan. An I–130 form is used to establish a close family relationship between a citizen or permanent resident alien and is the first step in the process of seeking permanent resident status.[18] Simon seized them because each referred to a relationship that would not qualify the alien applicant for permanent residency under the immigration laws. In addition, the names thereon appeared to be Filipino.[19] Simon explained why he believed such I–130 forms related to his investigation of defendant:

> Several of the Filipino nationals known to me prior to the search had visited Mr. Medows' office seeking work authorization. Mr. Medows would give them a form I–130 and call it an affidavit. He would say, "Have either a relative, a friend, whoever, sponsor you." They would leave their documents with him and take these two yellow forms back home returning several days later with the completed form and then picking up their passports and I–94. The relationship in all of the other I–130s would not be any immigration benefit under the present act.[20]

Item 10 is a letter from M. Bunuan to defendant, dated January 28, 1981. The letter states:

> Before everything, thank you for the help you've extended me. I hope for your continued success in life.

---

11. GX 33–16.

12. GX 2.

13. Tr. at 25.

14. Simon knew that Arlene Kodumal also used the name Susan Kodumal. Tr. at 26.

15. Tr. at 27.

16. GX 7.

17. Tr. at 28.

18. *See* 8 U.S.C. § 1255.

19. Tr. at 29, 41–42.

20. Tr. at 30.

I'd also like to know if the same thing could be done for a friend of mine who's been here for almost a year and working without a permit.

Then, I'd like to request if I could pay the $250 balance when I get a job and receive my first pay check.

Thirdly, please forward my passport and I-94 to this address:

> 1210 Bonner Ave.,
> Fremont, CA 94536

Lastly, could you inform me of what safeguards to take, what I can [and] cannot do until I get a blue card, etc.[21]

Simon seized the letter because Bunuan's reference to her I-94 form and passport indicated that defendant had caused a false "employment authorization" endorsement to appear on the I-94. In addition, Bunuan appeared to ask defendant to perform the same service for another nonimmigrant alien. Finally, Simon believed that an alien living in California could not legally obtain work authorization from New York.[22]

Item 13 is a blank INS G-28 form signed by Benjamin Guerra. A G-28 is an attorney's notice of appearance form. Item 14 is an I-551 form ("Green Card") in the name of Benjamin Guerra, stapled to an I-130 form made out in the name of Reynaldo Guerra. Benjamin Guerra is listed on the I-130 as the permanent resident alien sponsor of Reynaldo Guerra. Reynaldo Guerra is one of the aliens mentioned in the search warrant and defendant has not challenged the admissibility of the I-130 portion of item 14. The I-130 and Benjamin Guerra's Green Card were physically attached when Simon seized them, although at the time he did not know whether defendant intended to use the Green Card with respect to Rey-

naldo Guerra.[23] He seized both item 13, the G-28 form, and item 14 because he believed that the relationship between Benjamin and Reynaldo Guerra would not qualify Reynaldo for permanent residency.[24]

Item 16 contains a completed rough draft of an I-130 form in the name of Rene Manalo and two blank I-130 forms signed by George Manalo. Rene Manalo was listed as one of the sixteen aliens in the warrant and George Manalo was Rene's permanent resident alien sponsor on the rough draft. Simon thus seized all three documents.[25] Simon also believed that in his scheme, defendant made use of the blank signed I-130 forms in the following manner:

> Upon visiting Mr. Medows in his office, Mr. Medows would give the aliens blank I-130s. On some of them he instructed those aliens to take these I-130s home with them and have somebody sign them, and the other copy they would use to fill in the necessary biographical information; and then it was understood that he would transfer the biographical information onto the I-130 that was already pre-signed.[26]

Item 26 is a Philippine passport in the name of Carmencita L. Alfredo, whose name does not appear on the warrant. A completed I-94 form is attached, containing an "employment authorization" endorsement. Simon testified that the I-94 and endorsement had characteristics identical to the twelve other completed I-94 forms he had encountered during the investigation and which he believed to be forgeries. Simon therefore concluded that the endorsement in item 26 was a forgery and, as such, evidence of a crime.[27]

---

21. GX 10.

22. Tr. at 31.

23. Tr. at 78.

24. Tr. at 34.

25. Tr. at 35–36.

26. Tr. at 36–37.

27. Tr. at 38–39. Simon found five or six other Filipino passports relating to nonimmigrant aliens on top of defendant's main desk. One had an I-94 form attached, but no "employment authorization" endorsement appeared thereon. One agent copied the names and other information contained in the passports, but they were not seized. Simon testified that these passports were not named in the warrant and did not contain evidence of any crime he was investigating. He decided to run a computer check on the names upon his return to his office. Tr. at 44–45.

Item 28 is a letter to defendant dated March 19, 1981, signed by Maria K. Adapon. The letter states that the writer cannot pay a "balance for [her] working visa" and must return immediately to the Philippines.[28] Simon seized the letter because he believed it to be written by a Filipino alien in reference to services performed by defendant as a part of the "employment authorization" scheme.[29]

## DISCUSSION

### Pretrial Discovery

Defendant made broad discovery requests pursuant to Fed.R.Crim.P. 16, to which the Government has substantially responded. Having reviewed defendant's requests and the Government's response, the Court is satisfied that the Government has complied with the requirements of Rule 16. Should any additional material within the coverage of Rule 16 come within the possession of the Government, the Government is directed to turn that over to defendant as well. The Court is also satisfied that the Government has complied with its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and 18 U.S.C. § 3500. The Government is directed to turn over to defendant any additional *Brady* material which comes to its attention.

### Inspection of Grand Jury Minutes

■ Defendant has requested that the Court inspect the Grand Jury minutes *in camera* to determine whether (1) "a sufficiently apprised jury intelligently found probable cause that mail and wire fraud was committed,"[30] (2) "the grand jury was properly instructed upon the elements of 18 U.S.C. § 1001 with respect to the social security applications and as to the level of conduct necessary to constitute aiding and abetting within 18 U.S.C. § 2,"[31] (3) "the grand jury understood the evidence it had to credit before it could vote a 'true bill' as

to count 29,"[32] (4) competent evidence was presented or the legal instructions were adequate to support Count 30, (5) a hearsay warning pursuant to the requirements of *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972), was given, and (6) exculpatory evidence was presented.

The Court finds that the indictment is valid on its face, and that defendant has not sufficiently particularized his allegations as to what the Grand Jury minutes might reveal. Therefore, it would be inappropriate for the Court to examine the minutes at this time. *See Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Moreover, the Government is not obligated to present to the grand jury exculpatory evidence or evidence that would undermine the credibility of Government witnesses, as long as the prosecutor does not mislead the grand jury or engage in unfair tactics. *See United States v. Ciambrone*, 601 F.2d 616, 622–23 (2d Cir. 1979). The Court is satisfied by the Government's representation that the Grand Jury was properly instructed as to the elements of the crimes charged, that proper hearsay warnings were given, and that exculpatory evidence was presented.

### Dismissal or Consolidation and Severance

■ Defendant has moved to dismiss the indictment essentially on the ground that the Government's evidence is insufficient to convict. In light of the Court's finding that the indictment is valid on its face, this motion is without merit. At the appropriate time during trial, the Court will entertain defendant's motion pursuant to Fed.R. Crim.P. 29, and will decide, based on the standards set forth therein, whether the Government has adduced sufficient evidence to sustain a conviction. At this time, defendant's motion is clearly premature, since the relevant questions of fact must be resolved at trial. *See Costello v. United States, supra*, 350 U.S. at 363, 76 S.Ct. at

---

28. GX 28.

29. Tr. at 40–41.

30. Notice of Motion to Dismiss at 5 (filed Dec. 10, 1981).

31. *Id.* at 6.

32. *Id.* at 7.

408; *United States v. Schlesinger*, 598 F.2d 722, 726 (2d Cir. 1979); *United States v. Black*, 291 F.Supp. 262, 264 (S.D.N.Y.1968). With specific reference to Counts 20 through 28, which charge violations of 18 U.S.C. §§ 1001, 2, the Court finds that the elements of the crimes are sufficiently stated in the indictment, particularly in light of the law governing aider and abettor liability.

■ In moving to consolidate Counts 1 through 19 into five counts, defendant argues that only five aliens are named in the indictment and that the number of counts should correspond to the number of aliens named. The law is clear, however, that each mailing and telephone call made in furtherance of a fraud scheme is a separate offense and can thus be charged as a separate crime. *See United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970). Therefore, defendant's motion to consolidate Counts 1 through 19 is meritless.

■ Defendant also argues that Counts 20 through 28, which charge violations of 18 U.S.C. §§ 1001, 2, should be severed because these alleged offenses are not sufficiently related to the other crimes charged in the indictment and are not part of the same scheme or plan. A cursory examination of the indictment, however, reveals that the Social Security fraud charged in Counts 20 through 28 is an integral part of the mail and wire fraud scheme charged in Counts 1 through 19 and 29 and 30. Therefore, because the Government has charged that all of the acts and transactions contained in the indictment are part of a common scheme, the Social Security fraud counts are properly joined pursuant to Fed.

**33.** Indeed, the Court credits Simon's testimony that he limited his inspection of defendant's files in the following manner: if the file had a name, he either reached into it or tapped the outside in search of the stamp, but did not read any documents. If the file had no name, he glanced at one or two documents to see if they contained the names listed on the warrant. Tr. at 18.

**34.** *See* Tr. at 92.

R.Crim.P. 8(a). *See United States v. Werner*, 620 F.2d 922, 926–28 (2d Cir. 1980).

*Suppression of Evidence*

■ Having reviewed Simon's affidavit and the evidence submitted therewith, the Court finds that probable cause for the seizure of the items set forth in the rider to the search warrant was established. In addition, the Court finds that the search was conducted in a proper manner and was not a "general, exploratory rummaging in [defendant's] belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *see Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). In view of the fact that the agents were looking for a small rubber stamp—which could have been concealed with ease anywhere in the office including in one of defendant's files—as well as for a number of specified documents from among the hundreds of documents and files, the search was of necessity systematic and thorough. The agents could not have carried out the search at all had they not at least glanced into or at each of the documents and files in the office. *See Andresen v. Maryland, supra*, 427 U.S. at 482 n.11, 96 S.Ct. at 2749 n.11.[33] Moreover, Simon's credible testimony established that the agents "confine[d] their search in good faith to the objects of the warrant." *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978).[34] In short, the Court finds that "the scope of the search [was] limited [to] the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *see Marron v. United States*, 275 U.S. 192, 195–96, 48 S.Ct. 74, 75–76, 72 L.Ed. 231 (1927).[35]

**35.** Defendant argues that the search was conducted without regard for the confidences of defendant's non-Filipino and nonimmigration clients. For that reason, he urges that all the evidence seized should be suppressed. The Court recognizes that law office searches may sometimes threaten the attorney-client privilege. *See generally People v. Hearty*, 644 P.2d

The foregoing finding disposes of defendant's objections to the items either specifically named in the warrant or containing the names of aliens mentioned in the warrant—items 1, 3, 4, 11, 12, 15, 17 through 25, 27 and 32.[36] The other documents seized—items 2, 6, 7, 9, 10, 13, 14 (I–551 form), 16 (blank I–130 forms), 26, 28 and 31—are not named in the search warrant and do not contain the names of aliens listed in the rider.[37] Defendant therefore claims that because these items were not seized pursuant to a warrant, they should be suppressed. The Government counters that the "plain view" exception to the warrant requirement is applicable to the seizure of these items. The Court agrees with the Government.

As recently stated in this circuit, the "plain view" exception provides that "seizure of physical evidence within the 'plain view' of officers who are legitimately in a position to obtain that view is permissible if the incriminating nature of the articles is readily apparent and the discovery of the items is inadvertent." *United States v. Spencer*, 522 F.Supp. 463, 466 (E.D.N.Y. 1981); *see Coolidge v. New Hampshire, supra*, 403 U.S. at 465–71, 91 S.Ct. at 2037–40; *United States v. Crouch*, 648 F.2d 932, 933–34 (4th Cir.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 491, 70 L.Ed.2d 259 (1981); *United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977); *Mapp v. Warden*, 531 F.2d 1167, 1172 (2d Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States v. Block*, 522 F.Supp. 451, 455 (D.Mass.1981). The doctrine has essentially four elements: (1) that the agents were legitimately on the premises, (2) that the agents were acting within the scope of the search warrant when they came across the items not mentioned therein, (3) that the incriminating nature of the items was immediately apparent, and (4) that the discovery of the evidence was inadvertent. *See Coolidge v. New Hampshire, supra*, 403 U.S. at 466–71, 91 S.Ct. at 2038–40; *United States v. Crouch, supra*, 648 F.2d at 933; *United States v. Spencer, supra*, 522 F.Supp. at 466–67.[38]

302, 312–14 (Colo.1982); Note, *The Assault on the Citadel of Privilege Proceeds Apace: The Unreasonableness of Law Office Searches*, 49 Fordham L.Rev. 708 (1981). On the other hand, this privilege belongs to the client, not his lawyer, and only the client or the lawyer on his behalf can assert it. Here, no client has asserted the attorney-client privilege or authorized defendant to assert it on his or her behalf.

Moreover, the Court does not believe that an attorney should be permitted to invoke the privilege when it is the attorney himself who is the subject of the investigation and search. *See* Note, *supra*, at 734. Indeed, the Justice Department has promulgated guidelines for law office searches, which expressly permit the search of a law office if the attorney is reasonably believed to be a suspect in a crime under investigation. *See* 46 Fed.Reg. 1302, 1303 (1981) (to be codified at 28 C.F.R. § 59.2(c)(1)). In addition, California, the one state to have legislated in this area, permits a comprehensive search of an attorney's office under similar circumstances. *See* Cal.Penal Code § 1524(c) (West Supp.1982). Of course, the Court recognizes that defendant's clients have an interest in the privacy of their files. But the Court finds that the agents made every effort to ameliorate any potential invasion of this privacy interest by asking defendant to cooperate in locating the evidence called for in the warrant and by permitting him to review every document seized before it was inventoried and removed from the office. *See* Tr. at 7, 14, 55, 62, 100–01. To place even greater constraints on Government agents in circumstances like these would unduly compromise proper law enforcement efforts.

**36.** The Court notes that items 3 and 15, which are legal-size pieces of paper containing several handwritten notations, are not formal immigration records or documents. Both, however, contain the names of Filipino aliens listed in the rider to the search warrant. The Court believes that both items fall within the scope of the warrant, but even if they do not, they were properly seized pursuant to the "plain view" exception to the warrant requirement. *See* discussion at pages 500–502 *infra*. Simon seized the items because of the names mentioned thereon. Tr. at 26, 34–35. As such, the items could reasonably be seen as leading to additional evidence of the crimes being investigated.

**37.** The seizure of items 5, 8, 14 (I–130 form), 16 (completed I–130 form), 29 and 30 is not in dispute. *See* notes 9–10 *supra*.

**38.** Defendant contends that the "plain view" exception is not applicable to law office searches because of the issues raised by the attorney-client privilege. Defendant has not advanced nor is the Court aware of any per-

In the instant case, the agents were legitimately on the premises pursuant to the warrant. They were also acting within the scope of the warrant in briefly examining the hundreds of documents and reaching into or tapping the outside of the files in their search for the elusive "employment authorization" stamp and the other documents and items mentioned in the warrant.[39] Thus, the seizure satisfied the first two elements of the "plain view" exception.

 With respect to the third element, the Second Circuit has held that "the incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of crime." *United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In *Ochs,* Judge Friendly further explained that "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In this examination, consideration of police purposes is required." *Id.* Moreover, in order for law enforcement officers to make this determination, the law permits them to make some fairly brief perusal of the documents discovered. *Id.* at 1257 n.8; *United States v. Crouch, supra,* 648 F.2d at 933 ("cursory reading" of letters contained in unsealed envelopes); *United States v. Mannino,* 635 F.2d 110, 115 (2d Cir. 1980) (opening and leafing through a notebook); *Mapp v. Warden, supra,* 531 F.2d at 1172 ("[I]t would be somewhat absurd to require an investigator [who read rent receipts] to be oblivious to that which would be apparent

to anyone else with normal powers of observation.").

The Supreme Court has not precisely defined what constitutes an inadvertent discovery, the "plain view" exception's fourth element, except to note what would *not* be an inadvertent discovery. In *Coolidge,* the Court stated that an inadvertent discovery does not occur "where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it," and does not include "objects . . . which the police know in advance they will find in plain view and intend to seize." *Coolidge v. New Hampshire, supra,* 403 U.S. at 470–71, 91 S.Ct. at 2040. The Second Circuit has further refined the inadvertence requirement: "For the Government to be charged with advance knowledge, it must at the very least have had probable cause to believe that the additional [evidence] would be found. Mere expectation or suspicion that discovery would occur does not preclude application of the plain view doctrine." *United States v. Liberti,* 616 F.2d 34, 37 (2d Cir.) (citations omitted), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980); *accord, United States v. Spencer, supra,* 522 F.Supp. at 467 (lack of "probable cause to know that the items would be where they were found").

In *United States v. Hare,* 589 F.2d 1291 (6th Cir. 1979), a case relied upon by Judge Van Graafeiland in *Liberti,* agents of the Bureau of Alcohol, Tobacco and Firearms ["ATF"] investigating the illegal transportation of firearms, obtained a warrant to search defendant's home. Prior thereto, the ATF agents had learned that the Drug

---

suasive authority to support this view. *See generally People v. Hearty, supra,* 644 P.2d at 312–14. In *Hearty,* the Colorado Supreme Court mandated rigid adherence to the particularity requirement when a nonsuspect attorney's office is searched for designated documents. The court nevertheless acknowledged the availability of the "plain view" exception in a law office search, but found that on the particular facts of that case the seizure of certain items was not justified because, in effect, the incriminating nature of the items was not immediately apparent. *Id.* at 313–14.

**39.** This case is similar to *United States v. Crouch, supra,* 648 F.2d 932, in which federal agents removed letters from unsealed envelopes to search for chemicals and drug paraphernalia named in a warrant, but which were not found. After being examined, the letters were seized because they contained information relating to the manufacture of a controlled substance. The court upheld the seizure under the "plain view" doctrine. *Id.* at 933.

Enforcement Administration ["DEA"] was investigating defendant for narcotics violations. The warrant, however, was limited to a search for illegally possessed firearms and ammunition, and did not mention narcotics or the DEA investigation, despite the fact that "both the DEA agents and the ATF agents expected that some drugs might be found." *Id.* at 1296. The search was conducted by ATF agents with DEA agents present to guard the doors and to assist in identifying narcotics if any were found. The agents discovered numerous guns and ammunition as well as a substantial quantity of illegal narcotics and drug paraphernalia.

The Sixth Circuit held that the discovery of the narcotics was inadvertent and that their seizure was lawful under the "plain view" exception to the warrant requirement. The court stated:

A search must be limited to the scope of the warrant, and the police officer must intend to search for the items specified therein; but if, in the course of such a properly limited search, the officer comes across other incriminating evidence, which he did not *know* he would find and thus did not intend to seize, its discovery is inadvertent.

Interpreting *Coolidge* is not an easy task, but it appears on careful reading that the Court meant only to condemn warrantless seizures when a warrant could have been obtained—in other words, when the exigency which normally accompanies a plain view seizure is not present. Ordinarily, in the course of an otherwise permissible search, if the police unexpectedly come across evidence, it would be likely to disappear or be destroyed if the police then had to obtain a warrant before seizure. In the words of *Coolidge*, "as against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement" if seizure is permitted under these circumstances. However, if the police had probable cause to believe they would

find the evidence or contraband *before* making the seizure, and had an opportunity to obtain a warrant, any exigency which results is of their own making, and cannot serve as grounds for a warrantless seizure.

We conclude, then, that "inadvertence" in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise-justified search. There are many times when a police officer may "expect" to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances exist, and no warrant could have been obtained before the discovery.

*Id.* at 1294 (emphasis in original). The court found that the agents lacked probable cause to believe they would find illegal narcotics and that the warrant and search was not "a pretense fabricated to mask the DEA's lack of probable cause." *Id.* at 1296.

▮ In the instant case, the Court finds that the discovery and seizure of the documents not mentioned in the search warrant or containing the names of the aliens listed in the rider was lawful under the "plain view" exception to the warrant requirement. The agents were entitled to peruse briefly each file and document encountered in defendant's office to ascertain whether there was probable cause to believe that the document or file was or contained evidence of the criminal activity under investigation. *See United States v. Ochs, supra,* 595 F.2d at 1257–58 & n.8. As outlined above, Simon's credible testimony established that he

had probable cause to believe that each disputed item seized was evidence of the crimes he was investigating. Some items certainly appeared to be stronger evidence than others, but all of the documents colorably were evidence of the crimes being investigated.[40] Therefore, the incriminating nature of the items was immediately apparent to Simon, and the third element of the "plain view" doctrine was satisfied.

Moreover, the discovery of the evidence was inadvertent. Simon's testimony established that, at most, the agents had a suspicion that additional incriminating evidence would be found during the search. The affidavit and evidence submitted therewith was a model of thoroughness, and fully set forth the scope of the investigation to that point. The Court finds that Simon was careful to limit his search warrant request to those times he had probable cause to believe he would find. He did not know he would find the other evidence and did not enter defendant's office intending to seize other evidence. Indeed, on cross-examination, Simon gave the following testimony:

Q. When you went into the office, did you reasonably expect—were you looking to find documents, evidence in relation to immigration work performed by Medows with respect to other aliens not named in the warrant?

A. No.

Q. Were you looking for those documents?

A. No.

Q. You were only looking for documents with respect to the names that appeared in the rider, correct?

A. Correct.[41]

In addition, no evidence was adduced at the hearing to indicate that Simon deliberately failed to mention the other items or aliens because he thought he lacked probable cause with respect to them. In short, the agents did not have probable cause to seize the additional evidence until they actually observed it during the course of the search, and thus could not have previously obtained a warrant for its seizure. *See United States v. Hare, supra,* 589 F.2d at 1294.

## CONCLUSION

In accordance with the foregoing, defendant's motions (1) for an order directing additional pretrial discovery; (2) for *in camera* inspection of the Grand Jury minutes; (3) to dismiss the indictment, or, alternatively, to consolidate Counts One through Nineteen into five counts and sever Counts Twenty through Twenty-eight; and (4) to suppress evidence seized from defendant's law office, are denied. Fed.R.Crim.P. 6, 8, 12, 14, 16.

Trial is to commence on June 8, 1982, at 10:00 a. m. in Courtroom 1106, as previously scheduled.

SO ORDERED.

---

**40.** All of the items seized were reasonably related to the criminal activity under investigation and for which the warrant was issued. *See Taylor v. Minnesota,* 466 F.2d 1119, 1121 (8th Cir. 1972), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973). The letters seized—items 2, 7, 10 and 28—were particularly incriminating because each contained thinly-veiled references to certain conduct Simon considered to be criminal. The incriminating nature of and relevance to the investigation of item 26—the passport of Carmencita L. Alfredo—was also particularly apparent. The attached I-94 and endorsement had the same characteristics as the twelve other completed I-94 forms he had obtained during the investigation.

**41.** Tr. at 92.