UNITED STATES of America

v.

Marcelino SEGOVIA–MELGAR, Maria
Angela Carillo, Maria Olympia
Segovia, and Maura Diaz—Perez.

Crim. No. 84–0157.

United States District Court,
District of Columbia.

Oct. 5, 1984.

William J. O'Malley, Jr., Asst. U.S. Atty., Washington, D.C., for plaintiff.

David C. Woll, Washington, D.C., for defendants.

JACKSON, District Judge.

## MEMORANDUM AND ORDER

Four individual defendants are charged in separate informations consolidated for pretrial proceedings with possession of false identification documents of the United States in violation of 18 U.S.C. § 1028(a)(6). All four were arrested in a fourth-floor apartment unit at 1601 Argonne Place, N.W., Washington, D.C., following execution of a search warrant on the premises at approximately 6:00 a.m., Wednesday, April 4, 1984, by three Immigration and Naturalization Service ("INS") agents. The warrant was issued by a U.S. Magistrate at 3:30 p.m. the preceding day, directed to the "special agent in charge or any authorized special agent of the INS," and commanded a search of the premises for "counterfeit identification cards, typewriters, and records of sales of counterfeit identification cards." [1]

Defendants have moved to suppress the articles seized in the course of the search, namely, counterfeit "green cards" and social security cards bearing their respective names, and certain statements made by them to the INS agents before being advised of their rights.

### I.

The evidence establishes, and the Court finds, that the warrant was properly executed, and that the INS agents acted throughout in good faith.[2] The search team, with a bilingual immigration officer in charge, and accompanied by several uniformed Washington, D.C., police officers, knocked on the locked apartment door three times, announcing their identity and purpose in both English and Spanish, and waited for a response after each knock. Hearing nothing, the agents forced the door and, with weapons drawn, entered the apartment, unaccompanied, however, by the police officers. The defendants were all found in the vicinity of the bedroom or bathroom in various stages of undress in keeping with the hour.[3] Once dressed they were taken to the living room and kept there while the search progressed. The allegedly counterfeit green cards and social security cards were taken from the males' wallets and the females' purses, respectively, found among their personal belongings at various places in the apartment. The defendants were asked their citizenship and each responded, "El Salvador." They were next asked for documents justifying their presence in the United States and each denied having any. They were then arrested as illegal aliens and given appropriate bilingual *Miranda* warnings. At no time did the INS agents consider the defendants

---

1. An affidavit of an INS investigator describing a six-month investigation into the production and sale of counterfeit alien registration cards ("green cards") and social security cards, including sales made to an undercover INS agent at the premises, established probable cause for the issuance of the warrant.

 The INS officers also obtained a warrant for the arrest of one Luis Alonzo Segovia, the principal suspect, who has since been convicted of a violation of 18 U.S.C. § 1028.

2. Two defendants, testifying through an interpreter, gave accounts of the search which suggest otherwise. The Court does not credit their testimony to the extent it charges the INS agents with improper conduct.

3. All defendants were apparently living in the apartment, and the government has not contested the standing of any of them to raise the issue of the validity of the search.

at liberty to leave, and each defendant was at some point handcuffed before departing the premises in custody. They were ultimately transported to INS headquarters and thereafter taken before a U.S. magistrate.

## II.

Defendants contend that INS agents cannot be authorized by warrant to search for property subject to seizure under the general criminal laws of the United States. The authority of INS agents to search pursuant to warrant derives from the Immigration and Nationality Act, 8 U.S.C. § 1357, which provides, in pertinent part, that any officer or employee of the INS:

> shall ... have the power to execute any warrant or other process issued by any officer *under any law regulating the admission, exclusion, or expulsion of aliens.*

*Id.*, § 1357(a)(4).[4] (Emphasis added). The warrant at issue here does not specify the crime suspected, but the affidavit of the investigator upon which it is based establishes probable cause to believe only that evidence of a violation of a provision of 18 U.S.C. § 1028, the False Identification Crime Control Act of 1982, would be found on the premises to be searched, and the warrant commands a search for and seizure of only that evidence.

The False Identification and Crime Control Act of 1982 makes no reference to aliens at all. In general, it makes unlawful the possession or transfer of false or stolen "identification documents" by anyone. The government argues here that it is a "law regulating the admission, exclusion, or expulsion of aliens," because its legislative history mentions illegal immigration among the social ills facilitated by the use of spurious credentials. But so also were drug- and arms-smuggling, flight from justice, myriad frauds against business and government, and tax evasion, all of which are committed by citizens and aliens alike. *See generally* House Report 97–802, at 2–3, 1982 *U.S. Code Cong. & Admin. News,* pp. 3519, 3520–22. Indeed, virtually any unlawful activity can be facilitated by the deceptions made possible through the use of false identification, not merely illegal immigration; correlatively, illegal immigration may on occasion be "facilitated" by violating any other criminal law which stands in the way. If the False Identification Crime Control Act can be said to be a law regulating the admission, exclusion, or expulsion of aliens, so also might every other criminal statute.

There are other indications, moreover, that Congress never intended the authority of INS agents to include searches in aid of general law enforcement. INS' mandate under the Immigration and Naturalization Act is primarily one of *civil* enforcement of the immigration laws, not criminal law enforcement. *Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211, 1222 (D.C.Cir.), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1981). In considering INS agents' use of a warrant to search commercial premises for employees found to be deportable aliens, the court said:

*U.S. v. Sigal,* 341 F.2d 837, 843 (3d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

Subparagraph (c) of Rule 41, Fed.R.Crim.P., states that a search warrant "shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States." Rule 41, however, is concerned with the exercise of judicial, not executive, power, *i.e.,* which judicial officers may authorize searches by warrant, and in what circumstances. It does not purport to determine which "civil officers" of the United States are authorized to enforce which specific laws.

---

**4.** The government suggests two other sources of authority: 18 U.S.C. § 3105 and Fed.R.Crim.P. 41(c). Title 18 U.S.C. § 3105 provides that "[a] search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution ...." But it is established law that § 3105 confers no substantive authority to execute warrants. It merely enlarges upon the common law rule that required search warrants to be directed to and executed only by a particular person. *See U.S. v. Martin,* 600 F.2d 1175, 1181 (5th Cir.1979);

The Supreme Court has explicitly held that the detention and deportation of illegal aliens is not criminal law enforcement activity. There are no sanctions of any kind, criminal or otherwise, imposed by law upon a knowing employer of illegal aliens. This warrant in particular was issued to aid the agency in the enforcement of its statutory mandate, not to aid police in the enforcement of criminal laws.

*Id.* at 1218, *citing Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). *See also Yam Sang Kwai v. Immigration and Naturalization Service*, 411 F.2d 683 (D.C.Cir.) *cert. denied*, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969) ("[section 1357(a)(1)] ... gives the officers [of INS] the authority to interrogate any alien as to his right to be in the United States. It does nothing more. It does not authorize interrogation of the alien concerning criminal matters ...." *Id.* at 686–87 (emphasis omitted)).

Then, too, the legislative history of the Immigration and Nationality Act, while not determinative, lends support to the proposition that the authority to execute warrants under § 1357(a)(4) is properly limited to searches for illegal aliens only. In the original version of H.R. 5678, the bill destined to become the Immigration and Nationality Act of 1952, section 287 (codified at § 1357(a)(4)) read:

When the Attorney General or any officer, designated either individually or as one of a class by the Attorney General for that purpose, has information indicating a reasonable cause to believe that in any designated lands or other property aliens are illegally within the United States, he shall issue his warrant authorizing the immigration officer named therein to go upon or within such designated lands or other property, other than a dwelling, in which the warrant states there may be aliens illegally within the United States, for the purpose of interrogating such aliens concerning their right to enter or remain in the United States.

H.R.Rep. No. 1365, 82d Cong., 2d Sess. 3–4; *see also, id.* at 55. While the language of the statute was substantially changed before final passage, without illuminating debate, this early version of the section shows Congress' attention to the search powers being given to INS agents focussed on enabling them to locate *people* present in the country illegally, not evidence of any crimes they may have committed.[5]

Lastly, implying a sweeping grant of authority for INS agents to execute search warrants for general law enforcement purposes from the language of § 1357(a)(4) does not withstand comparison to corresponding statutory provisions intended to empower other federal law enforcement officers to do likewise. *Compare* 21 U.S.C. § 878 and 18 U.S.C. § 3107.[6]

---

5. *U.S. v. McCormick*, 468 F.2d 68 (10th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973) and *Valenzuela Garcia v. U.S.*, 425 F.2d 1170 (9th Cir.1970), cited by the government, are not to the contrary. While those cases did state that "[i]mmigration officers and U.S. Customs Agents are not limited to investigate solely for the presence of illegal aliens," *McCormick*, 468 F.2d at 73, *quoting Valenzuela-Garcia*, 425 F.2d at 1173, the statements were premised on the fact that the agents were lawfully within the confines to be searched at the outset. In both cases defendants had been stopped in border searches for illegal immigrants, and the subsequent discovery of contraband was thus incidental to the initial lawful search for deportable aliens.

It should be noted that INS agents' powers of criminal arrest are limited as is their authority to search; they may arrest without warrant for only those felonies "cognizeable under [laws]

regulating the admission, exclusion, or expulsion of aliens ...." 8 U.S.C. § 1357(a)(4).

6. 21 U.S.C. § 878(2), which authorizes execution of search warrants by agents of the Drug Enforcement Administration, reads, in pertinent part:

"Any officer or employee of the Drug Enforcement Administration designated by the Attorney General may ...

(2) execute and serve search warrants, arrest warrants, administrative inspection warrants, subpenas [sic], and summonses issued under the authority of the United States."

18 U.S.C. § 3107, which authorizes execution of search warrants by agents of the Federal Bureau of Investigation, provides:

"The Director, Associate Director, Assistant to the Director, Assistant Directors, agents, and inspectors or the Federal Bureau of Investiga-

It is, however, unnecessary to determine whether the INS agents had actual authority to execute the warrant at issue here to decide the instant motion, for the question of the availability of relief does not turn upon their authority to search. The circuit courts have heretofore been divided as to whether the exclusionary rule ought to be applied to suppress otherwise admissible evidence seized pursuant to a warrant which later proves to have been improvidently or incorrectly issued. *Compare U.S. v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975) and *U.S. v. Pennington*, 635 F.2d 1387, 1389–90 (10th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 *reh'g denied*, 452 U.S. 955, 101 S.Ct. 3100, 69 L.Ed.2d 966 (1981) *with U.S. v. Martin*, 600 F.2d 1175, 1184 (5th Cir.1979) and *U.S. v. Hare*, 589 F.2d 1291, 1297 (6th Cir.1979). But decisions of the U.S. Supreme Court last term have held that the exclusionary rule does not operate in circumstances such as those presented by this case. *See United States v. Leon*, — U.S. —, —, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard*, — U.S. —, —, 104 S.Ct. 3424, 3427, 82 L.Ed.2d 737 (1984).

 In *Leon, supra*, the Supreme Court reversed a decision of the Ninth Circuit upholding the application of the exclusionary rule to suppress evidence seized pursuant to a "facially valid" warrant obtained on the basis of an affidavit later held by the district court to be insufficient to establish probable cause. Reiterating observations made in several of its other recent cases to the effect that imposition of the "exclusionary sanction" is an issue to be divorced from the existence *vel non* of a Fourth Amendment violation, *see Illinois v. Gates*, 462 U.S. 213, —, 103 S.Ct. 2317, 2324, 76 L.Ed.2d 527 (1983), and that indiscriminate application of the rule "to enforce ideals of governmental rectitude"

may impede the search for truth by preventing the use of otherwise inherently trustworthy tangible evidence, *see U.S. v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980), the court held the exclusionary rule inapplicable in those situations in which its minatory potential could not have deterred the official conduct later called into question. — U.S., at —, 104 S.Ct., at 3418. According to *Leon* the rule will continue to apply when an affidavit proffered to a magistrate to establish probable cause is wilfully or recklessly false—and the police know it. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). It will also apply when the magistrate who issues the warrant acts as an "adjunct law enforcement officer" rather than as the neutral and detached judicial officer he is supposed to be—and the police know it. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979). And it will apply if, despite the absence of falsehood in the affidavit or magisterial error in issuing a warrant, either or both instruments are so patently deficient that the police ought to know that one or the other, or both, cannot reasonably be relied upon. *Leon, supra*, — U.S. at —, 104 S.Ct. at 3422. If, however, the law enforcement officials have acted honorably, and in an objectively reasonable fashion, the exclusionary rule no longer operates to bar the use of evidence obtained by a technical Fourth Amendment violation.

 In the instant case there is no evidence whatsoever of inaccuracy, much less falsehood, in the affidavit submitted to the magistrate in support of the warrant. Nor is there evidence that either the INS agents or the magistrate were aware of any uncertainty as to the authority of the INS agents to search for evidence of violations of the False Identification Crime Control Act.[7]

---

tion of the Department of Justice are empowered to make seizures under warrant for violation of the laws of the United States."

**7.** At least one other district court case has, but only by implication, sanctioned a search by INS

agents pursuant to warrant for evidence to be used in the prosecution of nonimmigration-related crimes. *See U.S. v. Medows*, 540 F.Supp. 490, 500 (S.D.N.Y.1982).

Finally, the warrant itself conforms to all the requirements of Rule 41 save for the occult circumstance that the officer to whom it is directed is, perhaps, not "authorized to enforce" 18 U.S.C. § 1028. To exclude the evidence seized from the government's case-in-chief at trial of these cases would likely result in dismissals or acquittals solely to punish non-culpable Fourth Amendment violations, a consequence beyond the purpose of the exclusionary rule as redefined by *Leon*. The motion to suppress the documents seized will, therefore, be denied. .

### III.

The questions posed to defendants by the INS agents regarding their citizenship and immigration status were entirely proper and admissible for purposes of civil deportation proceedings under the Act, 8 U.S.C. § 1251 *et seq. See INS v. Lopez-Mendoza,* —— U.S. ——, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *accord, Blackie's House of Beef, Inc. v. Castillo, supra,* at 1218. The answers they elicited were, however, inculpatory in that they tend to prove both a motive for and knowledge of the illegal character of defendants' possession of the false identification documents found. In the context of a criminal prosecution, such interrogation must comport with the requirements of *Miranda.* It is clear that defendants were in custody at the time they were questioned, and the law is equally clear that statements made by suspects in direct response to custodial interrogation, but before being advised of *Miranda* rights, may not be used in criminal prosecutions for an offense to which the statements related.

It is, therefore, for the foregoing reasons, this 5th day of October, 1984,

ORDERED, that defendants' motions to suppress the tangible evidence seized at Apartment 430, 1601 Argonne Place, N.W., Washington, D.C., on April 4, 1984, are denied; and it is

FURTHER ORDERED, that defendants' motions to suppress their statements to INS agents to the effect that they are citizens of El Salvador and without valid documents evidencing their lawful presence in the United States made prior to their receipt of *Miranda* warnings are granted.