UNITED STATES of America, Plaintiff,

v.

Larry Wayne CASSITY, Stephen Gordon Lenk, Billy Sword, Defendants.

Crim. No. 77–80932.

United States District Court, E.D. Michigan, S.D.

April 2, 1985.

Ross Parker, Chief, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Edward Wishnow, Southfield, Mich., for Larry Cassity and Stephen Lenk.

Thomas Rosender, Pontiac, Mich., for Billy Sword.

## MEMORANDUM OPINION

FEIKENS, Chief Judge.

On August 11, 1978, a jury convicted defendants Larry Cassity, Stephen Lenk, Billy Sword, Terry Hines, and Raymond Dean for conspiracy to manufacture and manufacturing amphetamine. This decision was appealed twice and ultimately reversed by the United States Court of Appeals for the Sixth Circuit on the ground that the warrants obtained by police officers prior to installation and monitoring of three electronic homing transmitters ("beepers") were invalid and, consequently, evidence obtained as a result should have been suppressed at trial. *United States v. Cassity*, 720 F.2d 451 (6th Cir.1983) ("*Cassity III*"), *vacated*, —— U.S. ——, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984). The Court of Appeals' ruling was vacated by the United States Supreme Court and remanded for further consideration in light of the limited good faith exception to the exclusionary rule announced in *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *United States v. Cassity*, —— U.S. ——, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984). After carefully considering the parties' arguments on remand, I conclude that the disputed evidence in this case was obtained by officers acting in reasonable reliance on warrants issued by detached and neutral magistrates, and therefore was properly admitted at trial.

## I. BACKGROUND

The pertinent facts have been explained previously in this case and can be briefly summarized here. *See United States v. Cassity*, 631 F.2d 461, 462–63 (6th Cir.1980) ("*Cassity I*"); *United States v. Cassity*, 546 F.Supp. 611, 612–13 (E.D.Mich.1981) ("*Cassity II*"), *aff'd in part and vacated in part*, 720 F.2d 451 (6th Cir.1983), *vacated*, —— U.S. ——, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984). The case arose because of the undercover investigative efforts of a Drug Enforcement Administration ("DEA") Special Agent, John Graetz. Graetz posed as a supplier of precursor chemicals and equipment used in the manufacture of illegal narcotics. He supplied these goods to Jay Cody, the central figure in a conspiracy to manufacture amphetamine.

Over the course of Graetz's contact with Cody, he supplied Cody three different items in which hidden beepers were attached. The purpose was to facilitate surveillance of Cody so that the DEA could discover who else was involved in the conspiracy as well as the location of the clandestine laboratory used for manufacturing the narcotics. Graetz testified that electronic surveillance was necessary because Cody was very adept at detecting and avoiding visual surveillance.

The beepers used in this surveillance were attached to a can of ether, a can of benzene, and a heating mantle. The installation and monitoring of the first beeper was undertaken after securing a warrant from a magistrate on July 8, 1977. This warrant did not contain a time limit. Warrants for the other beepers were issued by a second magistrate, but only one of these warrants contained a time limit.

Monitoring of the beepers, combined with visual surveillance, allowed the DEA to locate the clandestine laboratory and identify other members of the conspiracy. On August 17, 1977, DEA agents executed a search warrant at the residence in which the laboratory was located. Defendants were subsequently indicted for conspiracy to manufacture and manufacturing amphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Prior to trial on these charges, defendant Cassity moved to suppress evidence obtained as a result of the beeper installed on July 11, 1977. After conducting an evidentiary hearing on this motion, I held that the evidence should not be suppressed, reasoning that beepers were merely a sophisticated substitute for visual surveillance and, in any case, the officers had sought the independent judgment of a magistrate concerning the propriety of the beeper surveillance. The charges against the defendants were then tried before a jury and each defendant was convicted.

In July, 1980, the Sixth Circuit held in an unrelated case, *United States v. Bailey*, 628 F.2d 938 (6th Cir.1980), that valid warrants, which included time limits, were required to monitor beeper signals. Three months later, it vacated the *Cassity* convictions in light of the *Bailey* decision, and remanded for hearings to determine whether the use of beepers violated defendants' legitimate expectations of privacy. *Cassity I.*

On remand, I held that defendants Cassity, Sword, and Lenk did have reasonable, legitimate expectations of privacy in the various addresses through which chemicals were traced by the beepers, but that a fourth defendant, Terry Hines, did not have such an expectation in a van rented by the government. I then considered whether the rule announced in *Bailey* should be retroactively applied. Determining that retroactive application of that rule would not further the purposes of the exclusionary rule, I held that the motion to

suppress had been properly denied and reinstated the convictions. *Cassity II.*

This decision was appealed and the Sixth Circuit affirmed the conviction of defendant Hines, but vacated the convictions of Cassity, Sword, and Lenk. *Cassity III.* After agreeing with the determination that the beepers violated these defendants' reasonable expectations of privacy, the Court of Appeals held that this Court had exceeded the scope of the remand when it considered *Bailey*'s retroactivity. This ruling was appealed to the Supreme Court, which vacated the Court of Appeals' decision and remanded the case for reconsideration in light of *United States v. Leon*, — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *United States v. Cassity*, — U.S. —, 104 S.Ct. 3581, 82 L.Ed.2d 879 (1984).

## II. DISCUSSION

### A. *United States v. Leon*

■ The exclusionary rule is a judicially created remedy that generally operates to exclude from criminal proceedings evidence obtained in violation of the Fourth Amendment. In *United States v. Leon*, — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court considered whether this rule "should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." 104 S.Ct. at 3409.

In analyzing this issue, the Court began by indicating that "it must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case-in-chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." 104 S.Ct. at 3412–13. As a general matter, the Court indicated that the "substantial social costs exacted by the exclusionary rule ... have long been a source of

concern," 104 S.Ct. at 3413, while the rule's effectiveness in deterring police misconduct—particularly objectively reasonable conduct—has frequently been questioned. 104 S.Ct. at 3419. Focusing on the situation in which officers have acted objectively reasonably, and in which a magistrate has issued a warrant, the Court found a clear imbalance in the costs and benefits of the rule:

> In short, where the officer's conduct is objectively reasonable,
>
>> "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act under the circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty."
>
> This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.

104 S.Ct. at 3420 (quoting *Stone v. Powell*, 428 U.S. 465, 539–40, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067 (1976) (White, J., dissenting) (footnote omitted).

Finding that the "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion," 104 S.Ct. at 3421, the Court established a limited good faith exception to the exclusionary rule. This "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." 104 S.Ct. at 3421 n. 23.

The Court did indicate that in some cases exclusion would be appropriate even if a warrant was obtained, although it repeatedly noted that this would rarely be the case. *See, e.g.,* 104 S.Ct. at 3422 ("When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time."); 104 S.Ct. at 3423 ("the rule's purposes will only rarely be served by applying it in such circumstances"). Specifically, suppression remains appropriate:

(1) "[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." 104 S.Ct. at 3421.

(2) "[W]here the issuing magistrate wholly abandoned his judicial role ...." 104 S.Ct. at 3422.

(3) Where the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" 104 S.Ct. at 3422 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)).

(4) Where the warrant is "so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 104 S.Ct. at 3422.

### B. *Leon's Retroactivity*

■ Defendants argue as a threshold matter that *Leon*'s good faith exception should not be retroactively applied to this case. They rely on the Court's elaboration of the standards governing retroactive application of Fourth Amendment decisions in *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). In *Johnson*, the Court retroactively applied the holding in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that "the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's

home to make a routine felony arrest." *Johnson*, 457 U.S. at 538–39, 102 S.Ct. at 2581 (footnote omitted). The Court indicated that "a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." 457 U.S. at 562, 102 S.Ct. at 2594. This rule is subject to certain exceptions such as cases establishing rules that are a clear break from the past, which "almost invariably" have been found nonretroactive. 457 U.S. at 549, 102 S.Ct. at 2587. *See also Shea v.Louisiana*, —— U.S. ——, —— n. 5, 105 S.Ct. 1065, 1070 n. 5, 84 L.Ed.2d 38 (1985) ("where the new rule of law is so clear a break with the past ... it has been considered nonretroactive almost automatically").

While the *Leon* decision almost certainly constitutes "a clear break from the past," *see United States v. Sager*, 743 F.2d 1261, 1263 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985), post-*Leon* cases have uniformly applied that decision retroactively. *See United States v. Henderson*, 746 F.2d 619 (9th Cir.1984); *United States v. Thornton*, 746 F.2d 39 (D.C.Cir.1984); *Sager*; *United States v. Segovia-Melgar*, 595 F.Supp. 753 (D.D.C.1984). In *Sager*, the only case even discussing the retroactivity issue, the United States Court of Appeals for the Eighth Circuit indicated that the *Johnson* approach to retroactivity was developed in a context quite different than that in which *Leon* arose. *Johnson* involved a situation in which the Court was abandoning clear principles that police officers had relied on. Because *Leon* is "more supportive of police conduct" it involves the reverse situation. *Sager*, 743 F.2d at 1264. In finding *Leon* retroactive, the Court rejected a literal application of the *Johnson* test because this would take the discussion in *Johnson* "completely out of context" and would fit it "into a situation wholly foreign to that for which [it was] written." *Sager*, 743 F.2d at 1263. The Eighth Circuit also supported this finding by pointing to the Supreme

Court's decision to vacate *Cassity* and other cases, suggesting that "[t]here is at least a fair inference ... that these vacations and remands for reconsideration represent *sub silentio* holdings that *Leon* is retroactive." *Sager*, 743 F.2d at 1264–65 (footnote omitted).

Without speculating on this last point, I am fully in agreement with the Eighth Circuit that this case involves a very different situation than *Johnson*. *Leon*'s retroactivity should be decided based on the relevant considerations identified in *Johnson*, rather than a mechanical application of the language in that case. The Court explained in *Johnson* that a balancing of three factors had traditionally determined "whether a 'new' constitutional rule should be retrospectively or prospectively applied: '(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.'" *Johnson*, 457 U.S. at 543–44, 102 S.Ct. at 2584 (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1070, 18 L.Ed.2d 1199 (1967)). Indeed, *Johnson*'s statement that rules which clearly break from the past are almost always nonretroactive was explained by the fact that in such circumstances, the second and third factors "have virtually compelled a finding of nonretroactivity." *Johnson*, 457 U.S. at 549–50, 102 S.Ct. at 2587. In contrast, in the inverse situation now before me, these considerations compel the conclusion that *Leon* is retroactive.

First, retroactive application of the *Leon* rule will obviously serve the purposes of that rule. *Leon* is predicated on the belief that suppression of evidence when police have reasonably relied on a magistrate's issuance of a warrant, entails significant and unacceptable social costs. Assuming that the officers in this case did act in good faith, *see* discussion *infra*, exclusion of evidence obtained from the beepers is precisely what *Leon* sought to avoid. Moreover,

the exclusionary rule's principal purpose—deterring police misconduct—would not be served by making *Leon* nonretroactive. Even if one assumes that the rule does deter in this context—and *Leon* expressly repudiates this assumption, *Leon,* 104 S.Ct. at 3418–20—that deterrent effect is realized at the time of the officers' conduct and would not be affected by *subsequent* rule changes.

Second, I agree with the Eighth Circuit that retroactive application of *Leon* "will not infringe on anyone's reliance interest." *Sager,* 743 F.2d at 1264. The conduct of police officers requires reliance on established, or at least predictable, Fourth Amendment prescriptions—in fact, the deterrence rationale for the exclusionary rule is founded on the assumption that the rule will encourage police to rely on these rules. In contrast, it simply ignores reality to suggest that these defendants have a comparable degree of reliance on the exclusion of evidence obtained by police who act reasonably pursuant to a warrant that is subsequently found invalid.

Finally, the *Leon* decision clearly indicates that applying the good faith exception to the exclusionary rule will have a beneficial effect on the administration of justice. The Court unequivocally expressed its view that suppression of evidence obtained in reasonable reliance on a warrant is antithetical to the sound administration of justice. In the Court's words:

"Our cases have consistently recognized that unbending application of the exclu-

sionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. Indiscriminate application of the exclusionary rule, therefore, may well "generat[e] disrespect for the law and the administration of justice."

*Leon,* 104 S.Ct. at 3413 (footnote omitted) (quoting *United States v. Payner,* 447 U.S. 727, 734, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980) and *Stone v. Powell,* 428 U.S. 465, 491, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976)).

In sum, each of the considerations identified in *Johnson* supports the retroactive application of *Leon.* I conclude that the decision is retroactive, and turn to its bearing on the dispute before me.

C. *Applying Leon* [1]

■ The warrants issued in this case were ultimately found defective because they did not contain time limits. To deter-

---

1. In *Cassity* II, I found that the officers had acted in "good faith" as part of my determination that the *Bailey* decision should not be retroactively applied. 546 F.Supp. at 620–21. While that discussion is relevant to the analysis here, it should be noted that it was in the context of an arguably broader inquiry into "good faith." Specifically, while the officers' decision to obtain a warrant despite doubts about the need to do so in some sense bears upon their "good faith," *see generally Tracking Katz: Beepers, Privacy and the Fourth Amendment,* 86 YALE L.J. 1461, 1464 (1977) ("In nearly every case, those attaching the beeper have done so without obtaining a search warrant. Most but not all courts have permitted this warrantless use."), it

is not clear that this factor may be considered in a *Leon* good faith inquiry. As *Leon* would not justify an officer's failure to secure a warrant in such circumstances, there is some question whether this factor would permit an officer to seek a warrant and then rely on it even if it is facially deficient. Consequently, I have not considered this factor in determining whether the officers acted in good faith.

At the same time, it should be noted that cases questioning the Fourth Amendment's application to beepers do have some relevance to the narrower inquiry required here: i.e., whether the absence of time limits in the warrants rendered them so facially deficient that the officer could not reasonably presume them to be valid.

mine the admissibility of evidence obtained pursuant to these warrants I must decide "whether a reasonably well-trained officer would have known that the [beeper searches were] illegal despite the [magistrates'] authorization." *Leon,* 104 S.Ct. at 3421 n. 23. This objective inquiry does not permit a court to rely on the benefit of hindsight, but instead focuses on the state of the law at the time the officers obtained the warrants.[2]

In this respect, it must be emphasized at the outset that the law governing beepers was in its infancy in 1977, when the warrants at issue here were secured. Although the "actual use of such devices had been rumored or reported since the rise of transistor technology in the 1950s ... [p]rior to 1975 there were no reported court decisions involving the legality of the bumper beeper and the gathering of evidence through its use." Dowling, *"Bumper Beepers" and the Fourth Amendment,* 13 CRIM.L.BULL. 266, 268 (1977).

While a number of beeper cases had been decided by 1977, the law was in a state of disarray, with courts reaching divergent results on the circumstances, if any, in which beepers were subject to the constraints of the Fourth Amendment. *See, e.g., United States v. Washington,* 586 F.2d 1147, 1154 (7th Cir.1978) ("The status of surreptitiously placed electronic tracking devices in the context of Fourth Amendment searches and seizures is not settled."); *United States v. Perez,* 526 F.2d 859, 862–63 (5th Cir.1976) (referring to "the riddle of whether an electronic 'bug' installed in the television found in Almarez's car ... constituted a search within the stric-

tures of the Fourth Amendment"), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976); *United States v. Bailey,* 465 F.Supp. 1138, 1139 (E.D.Mich.1979) ("A consistent policy with respect to beepers and Fourth Amendment rights has not yet evolved."), *aff'd,* 628 F.2d 938 (6th Cir. 1980); Marks & Batey, *Electronic Tracking Devices: Fourth Amendment Problem and Solutions,* 67 KY.L.J. 987, 989 n. 12 (1979) (referring to "the confused state of the law in this area"); Note, *Electronic Tracking Devices and Privacy: See No Evil, Hear No Evil, But Beware of Trojan Horses,* 9 LOY.U.CHI.L.J. 227, 235 (1977) (recognizing disagreement among courts, as well as authorities on electronic surveillance, as to "whether the use of an electronic tracking device is a search within the meaning of the fourth amendment"); Comment, *Fourth Amendment Implications of Electronic Tracking Devices,* 46 U.CINN.L.REV. 243, 251 (1977) (referring to "[t]he great division among federal courts in both their reasoning and results in the beeper cases"). Much of this uncertainty resulted from the fact that a beeper, unlike a bug or a wiretap, does not pick up the content of conversation—it only permits the monitoring of an object's location and movement (and, in some cases, whether the object containing the beeper has been opened). *See United States v. Emery,* 541 F.2d 887, 888 n. 1 (1st Cir.1976). In this sense, beepers are arguably analogous to pen registers, which have been determined to fall outside the scope of the Fourth Amendment. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).[3] *See United States v. Bailey,* 465 F.Supp.

---

Because these cases indicated that beepers were less intrusive than other surveillance techniques, they provided some support for the conclusion that time limits might be unnecessary in beeper warrants.

**2.** It should be noted that a police officer monitoring beepers pursuant to a warrant without time limits *today* would be hard-pressed to invoke *Leon*'s good faith exception. *See, e.g., United States v. Butts,* 710 F.2d 1139, 1150–51 (5th Cir.1983), *rev'd on other grounds,* 729 F.2d

1514 (5th Cir.1984) (*en banc*), *cert. denied,* —— U.S. ——, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984); *United States v. Bailey,* 628 F.2d 938, 944–46 (6th Cir.1980).

**3.** Although the rationale for *Smith* was that people have no reasonable expectation of privacy in the phone numbers they dial, this reasoning was sharply criticized in the dissents. It also appears that the majority was influenced by considerations that pertain to beepers as well as pen registers:

1138, 1140 (E.D.Mich.1979) ("The nature of the [beeper's] intrusion into privacy is not unlike the intrusion involved in card drops and pen registers."), *aff'd*, 628 F.2d 938 (6th Cir.1980). The less intrusive nature of the beeper led several courts to hold that beepers did not involve "search" or "seizure" within the meaning of the Fourth Amendment.[4]

It is in this context that I must consider whether it was reasonable for the police officers to install and monitor beepers after securing warrants that contained no time limits. Defendants point to the decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *United States v. Lamonge*, 458 F.2d 197 (6th Cir.), *cert. denied*, 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed.2d 110 (1972), holding that warrants without time limits are facially invalid, and argue that the warrants here were "so facially deficient ... that the executing officers [could not] reasonably presume [them] to be valid." *Leon*, 104 S.Ct. at 3422.

The warrants invalidated in *Berger* and *Lamonge*, however, involved devices that permitted monitoring and recording of conversations. In *Berger*, the Court emphasized that "[t]he need for particularity and

evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping." 388 U.S. at 56, 87 S.Ct. at 1882. The Court explained:

> By its very nature eavesdropping involves an intrusion on privacy that is broad in scope. As was said in *Osborn v. United States*, 385 U.S. 323 [87 S.Ct. 429, 17 L.Ed.2d 394] (1966), the "indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments," and imposes "a heavier responsibility on this Court in its supervision of the fairness of procedures...." At 329, n. 7 [87 S.Ct. at 433 n. 7].

*Berger*, 388 U.S. at 56, 87 S.Ct. at 1882.

Given the Court's emphasis on the context in which *Berger* arose, it certainly was not self-evident that the *Berger* holding would be extended to the less intrusive searches occasioned by beeper installation and monitoring. As Justice Brennan observed while dissenting in *Lopez v. United States*, 373 U.S. 427, 464, 83 S.Ct. 1381, 1401, 10 L.Ed.2d 462 (1963), "[t]he requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement." A

---

[A] pen register differs significantly from the listening device employed in *Katz*, for pen registers do not acquire the *contents* of communications. This Court recently noted:

> "Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers." *United States v. New York Tel. Co.*, 434 U.S. 159, 167 [98 S.Ct. 364, 369, 54 L.Ed.2d 376] (1977).

*Smith*, 442 U.S. at 741, 99 S.Ct. at 2581 (emphasis in original).

**4.** *See, e.g., United States v. French*, 414 F.Supp. 800, 803–04 (W.D.Okl.1976) (Monitoring beeper in package containing contraband made it impossible to conceal whereabouts of contraband

but "did not make it impossible for [defendant] to conceal his movements.... [T]he obtaining of this type of limited information is not a search within the mantle of the Fourth Amendment."); *United States v. Carpenter*, 403 F.Supp. 361, 364 (D.Mass.1975). (Because beeper did not overhear or record conversation, but only signaled that package had been opened, intrusion did not "rise to the level of a search requiring a warrant under the Fourth Amendment ...."). Courts continued to struggle with this problem after 1977. *See United States v. Clayborne*, 584 F.2d 346, 351 (10th Cir.1978). (While noting that monitoring beeper in private home would violate Fourth Amendment, Court held that monitoring beeper in clandestine laboratory "was vastly different from the use of the recording device in the telephone booth in [*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]. The invasion in *Katz* was of great magnitude in comparison with the intrusion here.").

court confronting the question might have held that beepers were sufficiently intrusive to require a warrant and a showing of probable cause, but not so intrusive as to require explicit time limits in the warrant. Indeed, the very nature of beeper searches made it clear that some relaxation of the Fourth Amendment "particularity" requirements imposed in different contexts would be necessary if beepers were ever to be permissible. *See United States v. Karo,* — U.S. —, 104 S.Ct. 3296, 3305, 82 L.Ed.2d 530 (1984) (discussing Government's contention "that it would be impossible to describe the 'place' to be searched, because the location of the place is precisely what is sought to be discovered through the search"). Alternatively, it was possible that beepers would be subjected to the requirements of Federal Rule of Criminal Procedure 41(c), which would mean that the warrant would in fact have to be *executed* within ten days, but would not be limited in duration to ten days. *United States v. New York Telephone Co.,* 434 U.S. 159, 169 n. 16, 98 S.Ct. 364, 371 n. 16, 54 L.Ed.2d 376 (1977).[5]

At the time the police officers in this case had to act, not a single case had considered the necessity of time limits in beeper warrants. *See United States v. Cofer,* 444 F.Supp. 146, 149 (W.D.Tex.1978) ("The Court has located no case in which a court has required, or even passed on, the necessity of circumscribing the time in which surveillance by electronic beepers could be undertaken."). As courts did begin to address this question in cases subsequent to the searches challenged here, they reached different conclusions. Notably, in *United States v. Rowland,* 448 F.Supp. 22 (N.D.Tex.1977), the Court rejected a challenge to beeper monitoring of an airplane 25 days after issuance of a warrant, even though the warrant did not specifically mention beeper monitoring and only authorized the search to be conducted at any time "within the next ten days." 448 F.Supp. at 23. The Court concluded that "[t]he warrant was executed by the physical invasion of the plane which took place within the ten day limitation. A new warrant is not required for every ten days the plane is actually being tracked." *But see United States v. Cofer,* 444 F.Supp. 146, 149–50 (W.D.Tex.1978). *See generally Marks & Batey, supra,* at 1002 n. 84 ("The issue of the length of time a warrant authorizing beeper use is valid has not yet been settled.").

Even as a consensus that beeper warrants required time limits began to evolve in the case law, the reasoning employed to reach this conclusion varied significantly, and courts also disagreed about the nature of the time limits. In *Cofer,* the Court analogized to Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2518(5) (1982), and concluded that beeper warrants should only be used for 30-day periods, subject to renewal. 444 F.Supp. at 150. In *United States v. Bailey,* 628 F.2d 938 (6th Cir.1980), the Sixth Circuit relied on the Fourth Amendment limitations articulated in *Berger v. New York* and held that beeper warrants required "reasonable termination date[s]" to pass constitutional muster. 628 F.2d at 945. In contrast, the lower court had reasoned that "[t]he Constitution does not require that a search warrant contain a time limitation." *United States v. Bailey,* 465 F.Supp. 1138, 1141 (E.D.Mich.1979) (footnote omitted), *aff'd,* 628 F.2d 938 (6th Cir.1980). After indicat-

---

**5.** In *United States v. Bailey,* 465 F.Supp. 1138 (E.D.Mich.1979), *aff'd,* 628 F.2d 938 (6th Cir. 1980), the Court used Rule 41(c), as well as Title III of the Omnibus Criminal Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982), as analogies for purposes of inferring time limits on beeper warrants (although the Court reached a conclusion, based on these analogies, very different than that suggested here). Addi-

tionally, there is substantial authority indicating that when there is a statutory provision to fall back on "failure of the issuing magistrate to actually specify in the warrant the statutory period within which the warrant must be executed will not lead to suppression." 1 W. RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 6.2(a) (1984) (footnote omitted).

ing that "it is necessary for the judge or magistrate issuing the [beeper] warrant to interpolate so that the warrant will satisfy constitutional standards and other standards, if any, imposed by law for the issuance of warrants," 465 F.Supp. at 1140, the Court found a "clear federal statutory policy" requiring time limits expressed in Title III and Rule 41 of the Federal Rules of Criminal Procedure. 465 F.Supp. at 1140–41.

The police officers in this case did not have the benefit of this judicial "interpolation." Consequently, they sought authorization of the beeper searches from two magistrates, and relied on the warrants that were issued. Based on the circumstances that I have elaborated, this is a paradigmatic case in which reliance on the magistrates' legal judgment was objectively reasonable. This conclusion is supported by the fact that two magistrates issued the warrants without time limits, *cf. Leon,* 104 S.Ct. at 3421 n. 23 (noting that a different magistrate's rejection of a warrant is relevant to the determination of objective reasonableness), and the warrants were also deemed adequate in my initial consideration of the motion to suppress. *Cf. Leon,* 104 S.Ct. at 3423 (pointing to "the opinions of the divided panel of the Court of Appeals" as evidence of officer's reasonableness). It is also noteworthy that prior to trial only one of the five defendants sought suppression of any evidence obtained as a result of the beepers, a rather extraordinary omission if the warrants were as patently deficient as defendants now claim.

I conclude that a reasonably well-trained officer would not have known that the beeper searches were illegal despite the magistrate's authorization. Accordingly, the exclusionary rule did not require the suppression of evidence obtained because of these searches. New trials are unwarranted and defendants' convictions are reinstated.

An appropriate order may be issued.